## B. STEINBRUNNER v. PITTSB. ETC. RY. CO.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 1 OF ALLEGHENY COUNTY.

Argued October 30, 1891—Decided January 4, 1892.
[To be reported.]

1. An erroneous statement of the evidence upon the pivotal fact in the case, in the charge to the jury, is a cause of reversal, even when inadvertently made and inconsistent with prior parts of the charge, as the influence which such statement may have had with the jury cannot be determined.
2. In an action for negligence resulting in death, the deceased having been shown to have been a healthy strong man, and his age, occupation and earning power having been made to appear, it was competent to show the expectation of life of such a man according to the Carlisle tables of mortality.
3. Being based upon general population, and not upon selected or insurable lives, the Carlisle tables are admissible in such a case, as some evidence competent to be considered by the jury in determining what was the actual expectation of life of the deceased: Shippen's App., 80 Pa. 391, distinguished.
4. The value of such tables, however, when applied to a particular case, will depend very much upon other matters, such as state of health, habits of life, social condition, etc.; and the attention of juries should be called pointedly to these qualifying circumstances.
5. An instruction, in an action against a corporation for a negligent killing, to consider the question of damages "from a broad and sensible point of view, and liberal, because it is not a case to cut off corners too closely," is unwise, to say the least, though perhaps not of itself requiring reversal.

Before Paxson, C. J., Green, Clark, Williams, Mc-Collum and Mitchell, JJ.

No. 206 October Term 1891, Sup. Ct.; court below, No. 535 September Term 1888, C. P. No. 1.

On August 2, 1888, Barbara Steinbrunner brought trespass against the Pittsburgh and Western Railway Company, to recover damages for the death of Xavier Steinbrunner, plaintiff's husband, alleged to have been caused by the negligence of defendant's servants. Issue.

At the third trial on April 21, 1891, the following facts were shown:

River Avenue in Allegheny City, adjoins and runs along the Allegheny river wharf. The defendant's railroad runs along the river, between the carriage-way of River Avenue and the wharf. Cherry street runs at right angles with River Avenue, terminating on the north line thereof and connecting therewith. The grade of these streets, at the point of their intersection, is about six and two thirds feet above that of defendant's railroad. Opposite the mouth of Cherry street is a wagon crossing over the railroad, at grade, largely used as a way of access to the wharf, especially by teamsters engaged in hauling coal from flat-boats moored at the wharf.

On February 4, 1888, about two o'clock P. M., Xavier Steinbrunner came down Cherry street in a low one-horse wagon, and while in the act of driving across the railroad in order to reach the wharf, was struck by a passenger train and killed. The testimony was conflicting as to the rate of speed at which the train was moving, and as to whether the bell was rung to give warning of its approach. There was testimony tending to show that when he was at the terminus of Cherry street, the deceased could have seen the approaching train when it was at a distance of fifteen hundred feet from the crossing, notwithstanding the fact that a side track, between the main track on which the train was running and River Avenue, was at that time occupied by freight cars that to a great extent obstructed the view. A witness for the plaintiff testified that the deceased stopped his wagon on the foot crossing at the mouth of Cherry street, on the north side of River Avenue, though the witness did not see him looking in either direction along

Statement of Facts.

the railroad, and did not notice what he did after stopping, as she left the window through which she had seen him, just after that. One of defendant's witnesses testified that when the wagon was about three feet from the side track, on the River Avenue side thereof, " the wheel kind of scotched," and the wagon stopped for a second, or nearly stopped, and the witness supposed that this was caused by the wheel running against a stone, but that the deceased did not look up or down the track. Other testimony for the defendant tended to show that the deceased drove straight on across River Avenue and down to the track, without stopping at any place, and that he had his head down and appeared to be doing something with a money-bag which he had in his hand.

It was claimed by the plaintiff that, in view of the positions occupied by the witnesses who testified to this effect, and of the fact that they appeared to have been observing the train, as well as the deceased, it was not improbable that he might have stopped and looked and listened without their noticing it. Parts of this testimony are quoted in the opinion of the Supreme Court, infra.

The plaintiff testified that her husband was a strong healthy man, forty-six years of age, and that his occupation was the keeping of a small grocery store and hauling coal. F. T. Lusk, a life insurance agent, was called and testified for the plaintiff as follows :

" Q. In your business, do you, as part of your business, do you become acquainted with the subject of expectation of life ? A. Certainly. Q. Can you tell what authorities are the best on that subject ? A. Well, the actuaries of any of our life-insurance companies are authority. Many of them are published. Q. Which are the best published, considered the best in your business ? Which are the ones in general use ? A. Why, Nathan Wylie or Sheppard Hohman's. Nathan Wylie's have been published for many years and are used by all the life-insurance companies. They are considered as accurate as any, or the most accurate. Q. Have you the tables with you ? A. I have. Q. Will you state to the jury what the expectation of life is of a man in good health, forty-six years of age ? "

Objected to as incompetent and irrelevant.

By the court : Objection overruled ; exception.[9]

By Mr. McCleave : " Q. Do you know the manner in which these tables are formed ? A. I do. Q. Upon what class of lives are the calculations based ? A. Upon lives without selection, just as they run, through the city or district, or a state."

By the court: " Q. Do you mean on insurable lives ? A. On insurable lives. They are not selected lives."

By Mr. McCleave : " Q. That is, these tables you are going to read from are Nathan Wylie's? A. Yes, sir. Q. In what community are the lives taken? A. I may say that Mr. Wylie gives no less than three tables. Taking the American experience, which was Sheppard Hohman's table, prepared in 1868 and taken from the experience of the Mutual Life Insurance Company of New York, from 1843 to 1868, and other helps that he had from English tables. Q. Then, are these calculations based upon the duration of life in any particular community ? A. The American table of experience for mortality is based on the expectation of lives in the United States. The combined experience which Mr. Wylie gives was based upon the experience of some seventeen life-insurance companies in the state of Great Britain, and also the Carlisle table of mortality he gives, shows how nearly all the tables agree. Q. Now, are they based upon lives in any particular occupation, or ordinary occupations ? A. There are, of course, some lives, such as coal miners and railroad employees and others of like hazardous occupation, who were not taken into account, but those that were deemed, or would be in ordinary employments deemed insurable. . . . . during that seventeen years, and of course, it would not take into account the whole expectation of life, but just during that period. Q. But that would be only those that were considered insurable ? A. True, but it is taken and so interpreted, to mean the insured lives, or rather the ordinary lives, of all persons that are insured. Q. In other words, an insurable life is the life of a man in ordinary health ? A. Yes, sir. Q. Without any known disease ? A. Well, all of the life companies gain from fifteen to twenty and twenty-five per cent on these tables, by careful selection. Q. But it is based, as I understand it, on the general average of ordinarily healthy lives? A. Yes, sir. Q. And those lives are discovered to be healthy after the examination of a physician at the time they are insured ? A. True."

By Mr. Woodward: " Q. Are general statistics taken into

account?   A. Well, the Carlisle table was on the population of one of the English cities during a term of years.   That was one of the first, but the object of the other tables being prepared was to see how near the mortality of the different companies during a period of years would compare with the statistics that had been previously collected.   Q. How does the Carlisle table compare with the Wylie table, then?   A. Well, the American experience of mortality and the combined experience are just about the same.   At different ages they vary a little."

By Mr. McCleave: " Q. The Carlisle tables are based upon selected lives in the city of Carlisle, aren't they?   A. Yes, sir."

By Mr. Woodward: " Q. Now, what would be the expectation of life of an ordinarily healthy, strong man at the age of forty-six? "

By the court: " If he kept a little store and drove a wagon."

" A. The Carlisle table would make it 23.81 years.   The American experience table, 23.8 years."

At the close of the testimony, the court, STOWE, P. J., charged the jury in part as follows:

There are two questions for the jury to consider.   The first is: Does the evidence show that the railroad company has been guilty of negligence?   In others words, was this train, at the time the accident occurred, running at an unreasonable and unusual rate of speed, and whether it was or was not, was it ringing the bell or giving the ordinary notice of its approach to a crossing. . . . .

That brings us to the conduct of the plaintiff himself.   You have heard it stated as a rule of law that a party undertaking to go over a railroad crossing, whether on foot or on horseback or in a vehicle, is bound to stop, look and listen.   The law says imperatively that he must do this. . . . .   In this case, it has been urged on one side that there is no evidence indicating that the deceased stopped at all.   One or two witnesses, and maybe more, swear, one of them positively, that Steinbrunner never stopped from the time he left Cherry street, or the crossing there, till he was struck.   ·Plaintiff's counsel is mistaken in saying that there was nobody swearing to that.   Another one or two swear that they were looking at him, and did not see him stop, but he might have stopped.   [The fact is uncontro-

Charge of Court below.

verted that he did stop on the crossing on Cherry street, just as he crossed over and came on River Avenue, but did he stop there for the purpose of looking out for trains? Did he look and listen, or did he merely stop? Stopping is not enough without he did it for that purpose, and did those other things necessary to inform himself of the approach of a train.] [7]

According to the argument of plaintiff's counsel himself, a train would come up so rapidly that it would get to the crossing, even though running at a regular rate of speed, while he was going down there, if he was coming slowly; and his common sense and familiarity with that place would indicate to him, or should, that a train would come up there while he was coming down to the crossing. [The fact that he looked and listened above, is not conclusive of the fact that he was free from negligence.] [8] It is for the jury to say under all the circumstances, whether, hemmed in, as the evidence shows, by these cars, and assuming that he could not see from above, as he ought to have seen, or that a train might have come rushing up to him, whether or not it was not his duty in regard to his own safety, to say nothing of the safety of those in the train, to have his wits about him, to stop and take some sort of observation by looking or listening, even if he could not see, by making some effort to discover whether or not a train was approaching, before he rushed right in front of one, and consequently into the jaws of death. These are matters, we think, entirely for the consideration of the jury. . . . .

The plaintiff's counsel requests the court to charge:

2. If the jury find a verdict for the plaintiff, they should find the damages on the basis of compensation for the loss, and that loss, legally recoverable, would be the amount which the deceased would probably have earned by his labor in his business, during the residue of his life and which would have gone to the benefit of his family, taking into consideration his age, ability and disposition to labor, and his habits of life, and that amount, as near as the jury can estimate and sum it up, should be the amount of their verdict, without regard to the fact that the amount seems large or small.

Answer: That is affirmed, but it needs some suggestions. It does not do to assume, in a case of this kind, notwithstanding the bills of mortality or expectation of life established by

Charge of Court below.

certain insurance companies, which, however, I think, are for your consideration as some basis, but not at all conclusive; it does not do to assume that because a man has an expectation of life, as all of us have, based upon these insurance tables, that therefore he will live that long. These expectations are based upon a collection of probably one hundred thousand people and taken through the average. One may die to-day, another to-morrow, and another the next day. Some one or half a dozen of this one hundred thousand may be dying every day; and therefore, it does not do to assume, because I have an expectation of life to a certain extent, that I am going to live that long. The likelihood of life is entirely uncertain. These tables are, I think, properly admissible for the consideration of the jury, in view of the possibilities of the case, but not conclusive. A verdict ought not to be based upon them; and yet they probably ought to be considered in this case, because they have been admitted with some view to the possibilities of a man living a longer or shorter time. Another thing is, basing it upon how much a man may make to-day. I may make a certain amount of money to-day; I might be turned out of office as soon as my term expires, and yet, if I were to be run down by a railroad train, it would not do to base a verdict upon my expectation of life at six thousand dollars a year. That would take away all probabilities and possibilities. Yet these things are to be considered by the jury. I may be working at a certain trade, at five dollars or ten dollars a day; I might be disabled next week and not earn anything at all. I might be running a store or manufactory, or have in charge a large mill, making money apparently, and yet I might fail next week and be in bankruptcy. All possibilities are to be considered. Therefore, after all is said and done, when the jury have looked at these things from a broad and sensible point of view, and liberal, because it is not a case to cut off corners too closely, they then get at their general notion, which they return in their verdict, as to what, probably, the damages were, or rather what the probable loss was to these parties, and return that as compensation.[6]

The defendant's counsel requests the court to charge:

1. Under all the evidence, the verdict must be for the defendant.

Answer: Refused.[1]

5. That it is the undisputed evidence in the case that the deceased, Steinbrunner, could have seen or heard the approaching train between the mouth of Cherry street and the place of crossing, and the fact of the collision shows that he either failed to see or hear it, or that he went on regardless of what his sight and hearing must have informed him; and in this he was guilty of contributory negligence, and the verdict must be for the defendant.

Answer: This point is refused, because it is for the jury to say what the evidence is; not for the court.[2]

8. That, the undisputed testimony showing that the deceased, Steinbrunner, drove upon the track immediately in front of the engine, and came into collision with it as soon as his horse was fairly on the track, the rate of speed at which the train was running cannot be the proximate cause of the accident, and no finding of negligence can be made here against the defendant based upon the speed at which the train was running.

Answer: Refused.[3]

9. That the uncontradicted and unimpeached evidence in the cause shows that the deceased did not look in either direction for an approaching train, from the time he came out of Cherry street into River Avenue until the accident happened, and that so failing to look is contributory negligence and the plaintiff cannot recover.

Answer: The evidence is for the jury to determine; but if the jury should find that the deceased did not look for an approaching train, as stated in this point, he was guilty of such negligence as will prevent a recovery in this action.[4]

—The jury returned a verdict for the plaintiff for $5,000. A motion for a new trial having been refused and judgment entered, the defendant took this appeal, assigning inter alia for error:

1–4. The answers to defendant's points.[1 to 4]

6. The answer to plaintiff's point.[6]

7, 8. The parts of the charge embraced in [ ] [7 8]

9. The admission of plaintiff's offer.[9]

*Mr. Johns McCleave,* for the appellant:

1. The testimony as to the view which the deceased might have had of the approaching train, if he had looked, is uncontra-

Arguments.

dicted; and while there is an apparent contradiction upon the question whether he stopped on the foot crossing at the mouth of Cherry street, there is none as to the matter of looking and listening. The direct and positive testimony for the defendant that he did not look in either direction, is unimpeached and undisputed. The legal presumption that he did his duty by looking both ways for approaching trains, is therefore rebutted, and the court should have charged that he was guilty of contributory negligence and the plaintiff could not recover: Reading R. Co. v. Ritchie, 102 Pa. 425; Penna. R. Co. v. Mooney, 126 Pa. 244; Delaware R. Co. v. Converse, 139 U. S. 472; McKee v. Bidwell, 74 Pa. 223.

2. The defendant's fifth point should have been affirmed on the authority of Carroll v. Railroad Co., 12 W. N. 348; Central R. Co. v. Feller, 84 Pa. 226; Penna. R. Co. v. Bell, 122 Pa. 58; Marland v. Railroad Co., 123 Pa. 487; Penna. R. Co. v. Mooney, 126 Pa. 252; Warner v. Railway Co., 141 Pa. 615. The statement of the court that it was an uncontradicted fact that the deceased stopped·at the mouth of Cherry street, was an error which did the defendant infinite harm; see Phila. R. Co. v. Alvord, 128 Pa. 47; Greber v. Kleckner, 2 Pa. 289; Musselman v. Railroad Co., 2 W. N. 105. And the life tables prepared for the use of insurance companies, based upon insurable lives, ascertained to be such by the examination of a physician, are inadmissible in a case of this kind. They are even incompetent for the purpose of fixing the value of a life-estate: Shippen's App., 80 Pa. 396. The answer to plaintiff's second point is therefore objectionable, because it contains constant references to these tables, and particularly because of the improper invitation to liberality given to the jury.

*Mr. Marcus A. Woodward,* for the appellee:

There is no pretence that the plaintiff did not make out her case, and this appeal is here wholly upon the strength of the case made out by the defendant.

1. It is perfectly clear, from the testimony for the plaintiff, that the deceased stopped on the crossing at the mouth of Cherry street, and the testimony for the defendant on this subject is perfectly consistent with this. It is not at all improbable that he might have stopped for the short time required for

looking and listening, without any notice of the stop being taken by defendant's witnesses, as they were giving their attention to the train, and as it does not appear that they were apprehending any accident.

2. So, he may have looked and listened any number of times, without any observation on their part. Whether the witnesses who testified as to the possibility of seeing the train at the mouth of Cherry street, made their observations under the same conditions, with respect to the number, kind, and position of the box cars on the side track, that existed on the day of the accident, it is impossible to tell, but it is almost certain that the conditions were not precisely the same.

OPINION, MR. CHIEF JUSTICE, PAXSON:

Upon the trial in the court below, it became a vital question of fact whether the deceased, Xavier Steinbrunner, stopped, looked, and listened just before he crossed the railroad track. One witness for the plaintiff, Miss Margaret Martin, testified distinctly that he did stop on the sidewalk crossing of Cherry street. There was positive evidence, however, the other way. Charles Rentz, a witness for the defence, testified that the deceased did not stop: "He didn't look either way; never looked either way; just came straight through." William Cernuska testified that he saw the deceased from the time he started down the hill until he was struck by the train; that he did not stop, nor look either way; that he had a bag in his hand, and was looking at it. William F. Crooks, another witness, says: "I noticed Mr. Steinbrunner just coming out of the foot of Cherry street, and he come on down, and when he got alongside of the side track, about three feet this side of the first track, the wheel kind of scotched. He stopped just about a second, and then he went ahead, and when the horse was about halfway over the main track the train struck him. . . . . He made no other stop. . . . . Didn't see him look up or down. He had his head down, kind of this way, (illustrating.) It seems to me he was counting some money or something. I know that he didn't look up or down. When his wagon checked for that short time, I thought he was going to wait till the train passed on." Under these circumstances we think it was error for the learned judge below to say to the jury: "The fact is

uncontradicted that he did stop at the crossing on Cherry street just as he crossed over and came on River Avenue, but did he stop for the purpose of looking out for trains?" See seventh specification. It may be the learned judge used this language inadvertently. This is probable from the fact that it is inconsistent with the portion of his charge which immediately preceded it. But, as it stands, it appears to be an erroneous statement of the evidence upon the pivotal fact in the case. We cannot say what influence it had with the jury. Where a judge states the evidence in two ways, one in favor of a corporation and the other against it, a jury may be depended upon to adopt the latter.

The sixth specification alleges that the court erred in answer to the plaintiff's second point. The point involved the measure of damages, and in most respects was correctly answered. But, when the learned judge told the jury that they should look at this question "from a broad and sensible point of view, and *liberal*, because it is not a case to cut off corners too closely," we think the expression was unwise, to say the least. Juries do not need encouragement from the court to give large verdicts against corporations, especially railroad corporations. Courts and juries should be just to both corporations and individuals, but no one has a right to be " liberal" with the money of other persons. While we are not prepared to say we would reverse for this reason alone, we have considered the matter of sufficient importance to call attention to it.

The only remaining specification of error which we think it necessary to refer to is the ninth, which alleges that the court erred in admitting certain evidence of the deceased's expectation of life, based upon the Carlisle tables. The question asked the witness was, " Will you state to the jury what the expectation of life is of a man in good health, forty-six years of age?" and the answer was: " The Carlisle table would make it 23.81 years; the American table, 23.8 years." Neither of the tables appears to have been offered in evidence, but, as the answer of the witness was based upon evidence obtained from them, their effect may well be considered in connection with this specification; and, as the American table depends upon the same principle as the Carlisle table, we will discuss the question more particularly in reference to the latter.

In estimating the damages for the death of the deceased, his expectation of life became an element of importance. His earning power being fixed by the evidence, the next question to be settled by the jury would naturally be, how many years will he probably live to exercise this power? This can never be decided accurately in single cases. The most a jury or any one else can do is to approximate it. A man may die in a day, or he may live to earn wages for twenty years. It follows that there must always be an element of uncertainty in every such case. But there are some rules to be observed which aid to some extent in such investigations. Thus, if a man is in poor health, especially if he is suffering from some organic disease which necessarily tends to shorten life, his expectancy is much less than that of a man in robust health. Again, the age of the person and his habits are among the important matters for consideration. It needs no argument to show that the expectation of life is much greater at twenty-one years of age than at fifty. The value of the Carlisle tables, as bearing upon this question, depends in a measure upon the manner in which they were made up. If based upon selected lives, that is to say, only upon lives which are insurable, they would be of value only for life-insurance purposes, and utterly useless to apply to unselected lives or lives generally. The evidence in this case is not very clear as to the mode in which these tables were composed. I have therefore consulted the Encyclopædia Britannica, a very high authority, volume XVIII., p. 169, from which I extract the following:

" The Carlisle table was constructed by Mr. Joshua Milne from materials furnished by the labors of Dr. John Heycham. These materials comprised two enumerations of the population of the parishes of St. Mary and St. Cuthbert, Carlisle (England), in 1780 and 1787, (the number of the former year having been 7677, and in the latter 8677,) and the abridged bills of mortality of those two parishes for the nine years, 1779 to 1787, during which period the total number of deaths was 1840. These were very limited data upon which to found a mortality table, but they were manipulated with great care and fidelity. The close agreement of the Carlisle table with other observations, especially its agreement, in a general sense, with the experience of assurance companies, won for it a large de-

gree of favor.  No other mortality table has been so extensively employed in the construction of auxiliary tables of all kinds for computing the value of benefits depending upon human life.  Besides those furnished by Mr. Milne, elaborate and useful tables based upon the Carlisle data have been constructed by David Jones, W. T. Thompson, Christopher Sang, and others.  The graduation of the Carlisle table is, however, very faulty, and anomalous results appear in the death rate at certain ages."

It appears, therefore, that the Carlisle table is based upon general population, and not upon selected or insurable lives.  In Shippen's App., 80 Pa. 391, it was held that the Carlisle table was not authoritative in determining the value of a life-estate, and the common-law rule of one third the capital sum was adopted as the measure of the life-interest.  It was said in the opinion of the court :

"As to the measure of the life-estate of Clayton T. Platt, we may add that the Carlisle tables are not authoritative.  They answer well their proper purpose, to ascertain the average duration of life, so as to protect life insurers against ultimate loss upon a large number of policies, and thereby to make a profit to the shareholders.  But an individual case depends on its own circumstances, and the relative rights of the life-tenant and the remainder-man are to be ascertained accordingly.  A consumptive or diseased man does not stand on the same plane as one of the same age in vigorous health.  Their expectations of life differ in point of fact."

We can understand that in a contest between a life-tenant and the remainder-man, the Carlisle tables would not serve as an authoritative guide.  In such instance the question must be decided upon its own facts.  But in a case like the one in hand, where the expectation of life of the deceased was a question of fact for the jury, we are unable to see why the tables referred to were not competent evidence.  Being intended for general use, and based upon average results, they cannot be conclusive in a given case.  That is not the question here.  It is whether they are not some evidence, competent to be considered by a jury.  Their value, where applied to a particular case, will depend very much upon other matters, such as the state of health of the person, his habits of life, his social surroundings, and

other circumstances which might be mentioned. While we are unable to see how such evidence is to be excluded, I must be allowed to express the fear that it may prove a dangerous element in this class of cases, unless the attention of juries is pointedly called to the other questions which affect it.

Upon the whole, we are of opinion the evidence referred to was properly received, and this specification is not sustained. The judgment is reversed, and a venire facias de novo awarded.