## Littman *v.* Bell Telephone Company of Pennsylvania, Appellant.

Argued May 1, 1934. Before SIMPSON, SCHAFFER, MAXEY, DREW and LINN, JJ.

*John C. Arnold,* with him *William H. Lamb,* for appellant.

*A. M. Liveright,* of *Liveright & Smith,* with him *Charles J. Margiotti* and *John C. Forsyth,* for appellee.

OPINION BY MR. JUSTICE MAXEY, May 24, 1934:

The plaintiff, Joseph Littman, owned a two-story brick flat-roofed building in Clearfield. The first floor was used for stores and the second floor for living apartments and offices. The offices and apartments had telephone service. The roof of the building had a skylight. The plaintiff claimed that at noon on October 29, 1930, he went on the roof of this building to examine possible leaks and that as he walked over to the skylight he tripped and fell on his right side and injured his right elbow and right shoulder. He said he "was knocked out by the fall" and after he "came to" he "was in severe pain." He "raised" himself with his left hand. He said that as he did so, "this wire" that he "tripped over" was "over the ankle" of his right foot. It belonged to the defendant company and was sagging on the roof. He said that he never gave any authority to the telephone company to have a wire there. Plaintiff claimed he has been disabled since the date of the accident, has suf-

fered continuous pain, and is unable to extend or raise · his right arm.

He obtained a verdict for $10,000. Defendant filed motions for a new trial and for judgment n. o. v. These were refused. This appeal followed.

The first assignment of error is predicated on the admission of the American Experience Table of (Insured) Mortality appearing in volume 41, Corpus Juris, page 216. The objection was that this table is based on a selected class of risks, whereas plaintiff on account of a preëxisting arthritis and a subsequent injury to his left arm and shoulder on April 16, 1931, might not be eligible to such a class. Defendant's contention was that this arthritis and second injury would adversely affect plaintiff's life expectancy. The table was admissible, at the court's discretion, but the jury should have received proper instructions as to its use.

The second assignment of error is that the charge of the court was inadequate in not stating that the table was made up of "selected risks," and in not instructing the jury to consider, as it used this table, the fact that plaintiff had received subsequent injuries which might affect his life expectancy; and that the instruction on the life table was generally inadequate. This assignment is sustained. This court said in McCaffrey v. Schwartz, 285 Pa. 561, 132 A. 810: "When tables of this character are part of the evidence in a case, the court should carefully instruct concerning their use, and all the factors which tend to limit their application ought to be stressed. It is not enough for the trial judge to charge......that the tables are of some aid, but not conclusive, in determining the probable life of the plaintiff. 'All the circumstances affecting the probable duration of plaintiff's life as disclosed by the evidence......should [be] called to the attention of the jury.' ...... The charge must include a survey of such matters as sex, prior state of health, nature of daily employment and its perils, if any, manner of living, personal habits, indi-

vidual characteristics and other facts concerning the injured party, which may affect the duration of his life." That portion of the charge in this case which relates to mortality tables falls far short of amounting to "careful instruction concerning their use." It is so larded with irrelevant matter as to be more obscurative than illuminating. The trial judge said: "The plaintiff introduced testimony here, what is called, I don't know whether it is the American table or the Carlisle table—the American table. As has been said to you, these mortality tables, the American table, is data gathered which indicates how long a man can expect to live if the bugs don't get him sooner. Under this testimony here, or the American table here, Mr. Littman being fifty years of age at the time of this injury, that is based from the present time, in 1930, at Mr. Littman's age that he has a reasonable right to expect to live between twenty and twenty-one years or a fraction over. I don't want to go into that too close, that is my expectancy, based on that age. That is only offered in here—you are not to accept that as binding upon you. We have to change that rule so often I am going to read it from the books. You are not to accept that for every one. That would be an absurdity, almost an absurdity, to call your attention to it, to assume. This same table says, which is introduced in evidence, that a man fifty years of age is going to live twenty years, until he is seventy or seventy-one, to accept that as gospel." The trial judge after reaching the seventeenth syllabus of the case of McCaffrey v. Schwartz, supra, then said: "I call your attention to all the testimony which may have any bearing on any or all these particular conditions which I called to you. I am particularly impressed with this which says personal habits. You recall the story of the man who said he lived to be a hundred because he never smoked, chewed, drank, or swore, and his neighbor admitted that his old age was due because he smoked all he could get and drank all he could get. Take all these things into con-

sideration." He then proceeded in language equally misty to discuss the "present worth" of the total sum the plaintiff would lose in the future through the alleged impairment of his earning power.

Accredited life tables are admissible in actions for damages resulting in death or in permanent impairment of earning power. In such a case the victim's expectancy of life is an important factor in the jury's calculations *after* it is determined that his injuries resulted solely from defendant's negligence, and *after* it is further determined that the injuries caused either his death or a permanent impairment of his earning power. When the jury has determined the victim's annual pecuniary loss brought about by the latter, it next becomes important to determine what his reasonably justifiable expectations of life duration were just before he received his fatal or incapacitating injuries. How long a person will live to profit by his earning power "can never be decided accurately in single cases. The most a jury or any one else can do is to approximate it. A man may die in a day, or he may live to earn wages for twenty years. It follows that there must always be an element of uncertainty in every such case. But there are some rules to be observed which aid to some extent in such investigations. Thus, if a man is in poor health, especially if he is suffering from some organic disease which necessarily tends to shorten life, his expectancy is much less than that of a man in robust health. Again, the age of the person and his habits are among the important matters for consideration": Steinbrunner v. Pgh., etc., Ry. Co., 146 Pa. 504, 515, 23 A. 239.

The life table admitted in the instant case was based upon "selected lives," i. e., good insurance risks, at the respective ages set forth, and all the table shows is the average number of years these persons, from whose subsequent life histories the table was made up, actually lived. The table contains only general conclusions, but from these general conclusions it is a fair inference that

the average durations of life of other persons of corresponding age who could also qualify as good insurance risks will be about the same as the average life expectancy so tabulated. The general conclusions of these life tables may therefore be used as "helps" to a jury in coming to a conclusion as to how long an injured person's life expectancy was at the time he received the alleged incapacitating injuries. Mortality tables are only to be used as a factor with all the other factors in the case, from which totality of factors the jury is to determine as best it can the life expectancy in issue. When the jury has these tables before it and locates on them the age of the person whose life expectancy is in issue, it is, on that issue, not at the *end* but merely *at the starting point* of its calculations. Such tables do not assume to establish as a certainty that any person of the age indicated will live for the identical period specified. With the expectancy indicated by the table as a basis of calculation, the jury must consider the person's health, habits, occupation, surroundings and any other elements which in his case will be likely to operate for or against his longevity. See Pauza v. Lehigh Valley Coal Co., 231 Pa. 577, 80 A. 1126.

In the instant case the jury should have been instructed that in estimating plaintiff's life expectancy it must consider, among available factors of calculation, plaintiff's previous arthritis and his subsequent injury as bearing on the question of his probable duration of life. However, the injuries for which redress is sought cannot be considered as a factor in the jury's calculations as to longevity as that would be permitting the defendant to benefit by its own wrong.

When the jury by a proper method arrives at an estimate of the claimant's life expectancy it must then carefully note that *life expectancy* and the *duration of one's ability to earn money* are not identical, and it must consider not only the number of years that he will be likely to live, but also take heed of the fact that his earning

power will diminish as his physical and mental strength decline. At just what age any particular person reaches his peak of efficiency, either mental or physical, is also a matter of approximation. In the so-called "brain workers" this age at which the maximum efficiency is attained is more likely to be later than in persons whose work is largely manual. After the expectancy of life has been determined, due allowance must be made by the jury for the decline in earning power inevitable upon the abatement of mental and physical vigor. See Reitler v. P. R. R. Co., 238 Pa. 1, 85 A. 1000, and Burns v. P. R. R. Co., 219 Pa. 225, 68 A. 704.

In every case of damages claimed for loss of future earning power the jury must, of course, first conclude from the evidence whether the alleged impairment of earning power is permanent or only temporary. If it is only temporary, life tables serve no purpose, and the jury must determine when the earning power is likely to change for the better or be restored to its normal status (as the case may be), and adjust its award accordingly.

Furthermore, in making an award for the impairment of earning power the jury must bear in mind that when the gross amount of what claimant will lose in future earnings has been calculated, this amount will have to be reduced to its "present worth," i. e., to a sum which if paid on the date of the verdict would *then* be a just cash equivalent of the sum total of such lost future earnings. The ward for permanent impairment of earning power must not exceed, though it should equal, *the worth at the date of the verdict,* of a sum payable in normal future installments during what would be the period of the injured person's ability to earn money had he not received the injury or injuries complained of. This sum would be made up by adding the money losses the injured person will sustain from year to year or month to month by reason of such impairment of his ability to earn money, during the reasonably expected duration of his life's future earning period. It is, of course, mathemati-

cally certain that this "present worth" will be substantially less than the gross sum of computed lost future earnings; and the longer the person's life expectancy, the wider will be the gap between this gross amount of calculated lost future earnings and its contemporary value. Concrete illustrations may be used by the trial judge in explaining "present worth."

Appellee cites in support of the proposition that his prior arthritis and second injury should not be considered by the jury as bearing on his life expectancy, the cases of Maher v. Phila. Traction Co., 181 Pa. 391, 37 A. 571, and Paul et al. v. Atlantic Refining Co., 304 Pa. 360, 156 A. 94. These citations avail plaintiff not at all. In the first named case a child six years of age was struck by a street car, and died about seven months later, as a result of the injuries she received. The parents sued for damages and the court held that "in a negligence case where the plaintiff has died and the action has survived to his personal representatives, recovery may be had, not only for the mental and physical suffering up to the time of plaintiff's death and diminution of earning power during a period of life which he would have probably lived had the accident not happened, but also for the value of the life." In the second case cited, the plaintiff who had recovered a verdict in an action for personal injuries due to the defendant's negligence died subsequent to the rendition of the verdict. That fact had, of course, no bearing on the case when it reached this court. If this plaintiff had died *from an independent cause* before the trial, and this suit had been carried on by his personal representatives, there could then have been no fact in issue as to his life expectancy. That question would have been at rest. Certainties are not the subject of speculation.

The third assignment of error was based upon the refusal of the court to permit the defendant to present evidence that the plaintiff "did elevate his hands to his head without bending over," and that he could use his left arm, which plaintiff claimed had been impaired by

the second accident, this *not* being the accident sued upon. Plaintiff had testified on cross-examination, without objection, that he "did not use the left arm at all." He was also asked: "Do you use your hands to undress or does someone have to undress you?" He answered: "Someone has to undress me," and that he could do "no part of his undressing at all." The court excluded the above offer so far as it referred to the use of plaintiff's left arm. In order to assist the jurors in arriving at a just verdict in this case, we think they ought to have been permitted to know whether or not the plaintiff's arms had become as useless or nearly so, as he testified they were. This assignment is sustained.

The fourth assignment (which we sustain) is based on the charge of the court as to the proper test for compensation for pain and suffering. On this point the court charged as follows: "It is not what you would take to undergo pain but what would be fair compensation to try to reimburse an individual for pain and suffering he has undergone, trying to base it on an employment standard, that is cold-blooded, without sentiment. What would be a fair reasonable compensation to a man for pain and suffering, that he has undergone, and allow that. Compensation is used by the law, that word is used deliberately in covering damages to be allowed for pain and suffering. I use that word with the idea to impress on the mind of the jury it is to be the same which would be fair and reasonable as though hired and employed—that is, to leave aside all sentimentality on it." At the close of the charge when the trial judge's attention was called to the language just quoted, he corrected it only to this extent: "We should not have used the term hire and employ." The language quoted, inclusive of the "correction," was an exceedingly dubious guide. Pain and suffering are not subjects of employment. A verdict for pain and suffering measured by what jurors would demand for themselves if "hired and employed" to undergo the same would be an intolerable anomaly.

This court in Baker et al. v. Pa. Co., 142 Pa. 503, 21 A. 979, held it was error to give to the jury an instruction which in effect was "to suggest the price in money sufficient to induce a person to undergo voluntarily the pain and suffering for which a recovery was sought in the action, as a measure of the compensation due the plaintiff for having been subjected to it."

In Goodhart v. The P. R. R. Co., 177 Pa. 1, 14, 35 A. 191, this court said: "Pain and suffering are not capable of being exactly measured by an equivalent in money,......they have no market price. The question in any given case is not what it would cost to hire some one to undergo the measure of pain alleged to have been suffered by the plaintiff, but what under all the circumstances should be allowed the plaintiff in addition to the other items of damage to which he is entitled, in consideration of suffering necessarily endured." We said in Herb et ux. v. Hallowell, 304 Pa. 128, 133, 154 A. 582: "Earning power and dollars are interchangeable; suffering and dollars are not. ...... It is......the duty of the trial judge to make it clear to the jury that in awarding. damages for pain and suffering the award must be limited 'to compensation and compensation alone.'"

The fifth and sixth assignments of error (which we sustain) are based upon the evidence admitted in the charge of the court to the effect that the plaintiff could recover for the aggravation of a preëxisting disease, even though this was not averred in the plaintiff's statement. It is conceded that the pleading does not mention arthritis, or any other preëxisting disease. The court permitted over objection a physician to testify that the injury complained of "caused arthritis or superinduced the condition, or aggravated the condition already existing." It is argued by appellee that this error is harmless and that the evidence received over objection is harmless error due to the fact that substantially the same testimony was already before the jury. We need not discuss this further than to say that the case must be retried and

unless the statement is amended before the next trial, such evidence should be excluded. Furthermore, if this evidence was all admitted without objection this would not justify the court in charging the jury as it did in response to the suggestion of plaintiff's counsel that "even if the jury find that Joseph Littman had a mild form of arthritis prior to the date of the injury, if the injury was of such a nature to aggravate the preëxisting condition to bring about the condition, nevertheless, it is compensable." To charge that the plaintiff could recover for the aggravation of the preëxisting arthritis was to permit a recovery for something not pleaded. This court said in Krajkowski v. P. R. T. Co., 282 Pa. 104, 107, 127 A. 429: "......defendant ought to be able to rely upon the assumption that plaintiff's evidence will be confined to its [statement of claims] averments." See 21 R. C. L., section 148, page 603.

The seventh assignment is overruled, for the court's refusal to allow cross-examination of plaintiff as to the latter's then pending action at law against an insurance company on a policy covering disabilities, was proper. Insurance in behalf of the injured person or any other compensation from a collateral source, cannot be set up by the wrongdoer in mitigation of damages. See Ridgeway v. Sayre Elec. Co., 258 Pa. 400, 102 A. 123, and 17 C. J., page 929, section 228.

The eighth assignment of error is based upon the court's permitting a physician to testify that the plaintiff suffered "the pain that he complains of." This assignment is sustained. A physician can testify as to the nature of a patient's injury, and its inevitable or usual concomitants, and as to the patient's exclamations and complaints of present existing pain, but pain being a subjective phenomenon, only the person who experiences it is competent to testify as to its actuality. The question of the competency of a physician's testimony as to what the patient said in describing his bodily conditions does not arise here.

The ninth assignment of error is based on the court's refusal of a directed verdict for the defendant on the ground of plaintiff's contributory negligence, and the tenth assignment is based on the refusal of the entry of judgment n. o. v. for defendant. Both are overruled.

The judgment is reversed with a venire.