Walter J. COWARD, Appellee,

v.

OWENS–CORNING FIBERGLAS
CORPORATION, et al.

Appeal of Owens–Corning (Formerly
Known as Owens-Corning Fiberglas
Corporation), Appellant.

Albert L. Vecchione and Loretta
Vecchione, h/w, Appellees,

v.

Owens–Corning Fiberglas,
Corporation, et al.

Appeal of Owens–Corning (Formerly
Known as Owens-Corning Fiberglas
Corporation), Appellant.

William J. Watts, Appellee,

v.

Owens–Corning Fiberglas
Corporation, et al.

Appeal of Owens–Corning (Formerly
Known as Owens-Corning Fiberglas
Corporation), Appellant.

Joseph Poplaski and Loretta Poplaski,
h/w, Appellees,

v.

Owens–Corning Fiberglas
Corporation, et al.

Appeal of Owens–Corning (Formerly
Known as Owens-Corning Fiberglas
Corporation), Appellant.

Superior Court of Pennsylvania.

Argued Feb. 4, 1999.
Filed April 14, 1999.

Ann C. Lebowitz, Philadelphia, for Owens-Corning, appellant.

Edward M. Nass, Philadelphia, for appellees.

Before JOHNSON, SCHILLER, and BROSKY, JJ.

JOHNSON, J.:

¶ 1 In this product liability case, we are asked to determine whether a plaintiff should be afforded the use of a rebuttable presumption that he or she would have followed an adequate warning had one been given where warnings or instructions are required to make a product non-defective and a warning has not been given. We conclude that Pennsylvania jurisprudence poses no impediment to the adoption of such a "heeding presumption." Accordingly, we find no error in the rulings of the trial court and, for the following reasons, we affirm.

¶ 2 Owens–Corning Fiberglas Corporation (Owens–Corning or the company) appeals the order denying its motions for post-trial relief in four personal injury actions arising from the plaintiffs' exposure to asbestos products that Owens–Corning allegedly manufactured. Owens–Corning sought judgment notwithstanding the verdict, or in the alternative, a new trial, contending that the plaintiffs failed to adduce sufficient evidence to establish product identity and that the court abused its discretion in charging the jury on several elements of the plaintiffs' evidentiary burden.

¶ 3 Walter Coward, Joseph and Loretta Poplaski, Albert and Loretta Vecchione, and William Watts (Plaintiffs) commenced the underlying actions following medical diagnoses of mesothelioma or carcinoma in each of the male plaintiffs. Owens–Corning did not dispute Plaintiffs' claim that these conditions were caused by exposure to asbestos dust and fibers the men encountered in their respective places of employment, but asserted that there was insufficient evidence to establish that Owens–Corning manufactured the products to which the men were exposed.

¶ 4 Following extensive discovery, the court consolidated the matters for trial pursuant to Pa.R.C.P. 213(a), and conducted a reverse-bifurcated trial. In Phase I of the trial, the jury determined that each of the male plaintiffs developed their respective medical conditions as a result of exposure to asbestos. At the end of Phase I, the jury assessed damages as follows: to Coward, $1,430,000; to Poplaski, $1,529,000; to Vecchione, $2,134,000; and to Watts, $75,000. The jury also awarded damages for loss of consortium to Mrs. Poplaski for $300,000, and to Mrs. Vecchione for $550,000. Owens–Corning did not mount a defense during Phase I.

¶ 5 In Phase II of the trial, a second jury identified Owens–Corning products, as well as those of defendants GAF Corporation and Flintkote Company, as the specific cause of Plaintiffs' injuries. The trial court, the Honorable Edward B. Rosenberg, molded the respective verdicts to prorate the award of damages between the three defendants and reduced the Coward, Vecchione and Poplaski verdicts to reflect the plaintiffs' participation in the Johns–Manville Trust. *See Baker v. AC & S, Inc.,* 1998 Pa.Super. Lexis 1019, *withdrawn, modified,* 729 A.2d 1140 (en banc) (1999). Owens–Corning filed a Motion for Post Trial Relief incorporating requests for judgment notwithstanding the verdict (judgment n.o.v.), or in the alternative, a new trial. The court denied both motions and added damages for delay pursuant to Pa.R.C.P. 238. Owens–Corning filed this appeal.

¶ 6 Owens–Corning raises six issues on appeal, arising from the trial court's denial of its motions for judgment n.o.v and new trial. Those issues are stated by Owens–Corning as follows:

1. Did plaintiffs' remote proof of mere workplace presence fail to satisfy the strict product identification standards that were mandated in asbestos cases by [the Superior Court's] decisions in *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50 (1980), and *Samarin v. GAF Corp.*, 391 Pa.Super. 340, 571 A.2d 398 (1989)?

2. Did the instructions of the lower court improperly encourage the jury to return liability verdicts based on a reduced evidentiary burden that is inconsistent with [the Superior Court's] controlling decisions in *Eckenrod* and *Samarin*?

3. Is a new trial required because the trial court prejudicially compounded its instructional error in inequitably applying its rules on burden of proof?

4. Did plaintiffs fail to establish the important element of causation in this warning defect case where they adduced no evidence that they would have avoided the risks of defendant's product if they had been warned or more adequately warned of its defects?

5. Is a new trial required because of prejudicial error in the examination of a defense expert and inflammatory comments by a plaintiff-appellee?

6. Is a new trial required on damages where the lower court's instructions on hedonic damages and mortality tables improperly encouraged the jury to return inflated damage awards that were based on confusion, conjecture, and impossible life expectancies in these cases?

Brief for Appellant Owens–Corning at 4.

■ ¶ 7 Owens–Corning's fourth issue, questioning the propriety of Plaintiffs' reliance on the so-called "heeding presumption" to establish legal causation, raises a matter of first impression fundamental to the disposition of this case. Accordingly, we commence our discussion with that issue and address the remaining issues in the order presented.

¶ 8 Upon review of Owens–Corning's brief, we note that the company argues both the sufficiency of Plaintiffs' proof and alleged instructional error by the court. *Id.* at 37. However, because our disposition of the legal issues posed by the "heeding presumption" necessarily implicates the adequacy of the court's instructions, we will confine our analysis to whether the presumption is viable as applied in this case.

¶ 9 Our courts have opined, generally, that to establish legal causation, a plaintiff asserting a failure-to-warn defect claim "must demonstrate that the user of the product would have avoided the risk had he or she been warned of it by the seller." *Phillips v. A–Best Products Co.*, 542 Pa. 124, 131, 665 A.2d 1167, 1171 (1995). *See also Demmler v. SmithKline Beecham Corp.*, 448 Pa.Super. 425, 671 A.2d 1151, 1155 (reasoning that "[a]bsent proof that a more thorough or more explicit warning would have prevented Mrs. Demmler's use of [SmithKline's product], [the plaintiffs] cannot establish that SmithKline's alleged failure to warn was the proximate cause of Mrs. Demmler's injuries"). Owens–Corning contends that these decisions are dispositive of the issue of causation in this case because, as in *Phillips* and *Demmler*, the plaintiffs here failed to adduce any evidence that they would have avoided the hazard inherent in the underlying product even if they had been warned of its existence. Brief for Appellant, *supra* at 37–38. The trial court declined to require such proof, instead applying a rebuttable presumption at law to establish that had Owens–Corning provided an adequate warning, the male plaintiffs would have heeded it and acted to avoid asbestos expo-

sure. Trial Court Opinion, 9/4/98, at 27. The court described the presumption as a "logical corollary" of Restatement (Second) of Torts, Section 402A, comment j, which provides that "[w]here a warning is given *the seller* may reasonably assume that it has been read and heeded." *Id.* Plaintiffs argue that the court's ruling is supported by appellate decisions in thirteen other states, and a prediction by the United States Court of Appeals for the Third Circuit that the Pennsylvania Supreme Court would adopt the "heeding presumption" to establish legal causation in failure-to-warn defect cases. Brief for Appellees at 38–39. *See Pavlik v. Lane Limited/Tobacco Exporters International,* 135 F.3d 876, 883 (1998) ("We now predict that Pennsylvania would adopt a rebuttable heeding presumption as a logical corollary to comment j.").

¶ 10 Strict liability was adopted in Pennsylvania "when it became clear that the circumstances behind some injuries would make negligence practically impossible for an injured plaintiff to prove." *Walton v. Avco Corp.,* 530 Pa. 568, 576, 610 A.2d 454, 458 (1992). Our Supreme Court has molded Pennsylvania jurisprudence accordingly to assure injured plaintiffs a right of recovery, regardless of fault, if their injuries were caused by a product lacking any element necessary for its intended use. *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 94, 337 A.2d 893, 899 (1975); *Azzarello v. Black Brothers Company, Inc.,* 480 Pa. 547, 559, 391 A.2d 1020, 1027 (1978). This development, characterized by the adoption of Restatement (Second) of Torts, Section 402A, "reflects the social policy that a seller or manufacturer is best able to shoulder the costs and to administer the risks involved when a product is released into the stream of commerce." *Davis v. Berwind Corp.,* 547 Pa. 260, 266, 690 A.2d 186, 189–90 (1997). That policy derives from the recognition that "[i]n an era of giant corporate structures, utilizing the national media to sell their wares ... [it is] the consumer who must be protected." *Azzarello, supra* at 553, 391 A.2d at 1023–

24. The Supreme Court has concluded accordingly that "no current societal interest is served by permitting the manufacturer to place a defective article in the stream of commerce and then to avoid responsibility for damages caused by the defect." *Berkebile, supra* at 93, 337 A.2d at 898 (quoting *Salvador v. Atlantic Steel Boiler Co.,* 457 Pa. 24, 32, 319 A.2d 903, 907 (1974)).

¶ 11 To facilitate recovery of damages, a claim sounding in strict liability requires "only two elements of requisite proof: the need to prove that the product was defective, and the need to prove that the product was the proximate cause of the plaintiff's injuries." *Id.* However, in claims of failure-to-warn defect, our courts have opined that the plaintiff must show first that the hazardous condition of the product was a cause in fact of his injury, and then that the absence or inadequacy of warnings addressing that condition was the legal cause of his injury. *Ayers v. Johnson & Johnson Baby Products Co.,* 117 Wash.2d 747, 818 P.2d 1337, 1340 (1991), *cited with approval in Phillips, supra* at 132 n. 6, 665 A.2d at 1171 n. 6. *See also Sherk v. Daisy–Heddon,* 498 Pa. 594, 605–06, 450 A.2d 615, 621 (Hutchinson, Justice, concurring) (explaining "[o]n the facts of this case, we do not reach the issue of whether a failure to provide adequate warning was the ... proximate cause of plaintiff's injuries because such failure was not a cause in fact"). In toxic substance cases, such a showing would require that the plaintiff show first that his injuries were, in fact, caused by exposure to the product in question, and then that but for the absence of the warning he would not have been exposed. *See Phillips, supra* at 132, 665 A.2d at 1171.

¶ 12 Upon careful consideration of the foregoing decisions, we conclude that such a burden of production in toxic substance cases is not consistent with our Supreme Court's stated objectives in the adoption of Section 402A. *See Berkebile, supra* at 93,

337 A.2d at 898 (quoting *Salvador, supra* at 32, 319 A.2d at 907). Were we to require that the toxic tort plaintiff demonstrate failure-to-warn defect causation by introduction of affirmative evidence, we would, in some cases, preclude recovery, even where the evidence proved that the dangerous propensities of the product in fact caused the plaintiff's injuries. Moreover, the manufacturer would derive no incentive to market products labeled for safe use even as the dangerous propensities of its products caused death or serious injury. Such results are especially troublesome where, as here, the plaintiffs were exposed in the course of their employment under circumstances that provided them no meaningful choice of whether to avoid exposure. *See Coffman v. Keene Corporation,* 133 N.J. 581, 628 A.2d 710, 721 (1993) ("It is unreasonable to assume that an employee would leave his or her position once apprised of certain safety hazards when such hazards are not rectified by the employer."). We are thus compelled to recognize that the burden of production currently applicable to strict liability cases poses potential inequity in the context of toxic substance cases where the plaintiff faced exposure in the course of his employment.

¶ 13 Because no Pennsylvania court has addressed this potential, we consider as persuasive authority the decisions of other jurisdictions. In *Coffman,* the Supreme Court of New Jersey recognized that "in a failure to warn case, establishing that the absence of a warning was a substantial factor in the harm alleged to have resulted from exposure to the product itself is particularly difficult." *Id.* at 718. The court reasoned that because "[a] plaintiff who uses or is exposed to a defective product in the course of his or her employment may not be able to exercise meaningful choice with respect to confronting the risk of injury posed by the product," he may never be able to establish that he would have avoided exposure had he been warned. *Id.* at 721. To avoid such results and to deter "those manufacturers who would rather risk liability than provide a warning which would impair the marketability of the product," the court imposed a presumption at law that had the plaintiff been warned, he would have heeded the warning. *Id.* at 719. However, recognizing as do we, that the manufacturer is not an insurer of its product, *Azzarello, supra* at 553, 391 A.2d at 1024, the court held the presumption rebuttable upon evidence that the plaintiff would have disregarded a warning even had one been given. *Coffman, supra* 628 A.2d at 719. The court explained its ruling as an affirmation that the test for causation must address the factual cause of the plaintiff's injuries: "Evidence that a plaintiff would have disregarded an adequate warning would tend to demonstrate that the plaintiff's conduct, rather the absence of a warning, was the cause in fact of the resultant injury." *Id.* at 721.

¶ 14 Upon review of failure-to-warn defect cases in Pennsylvania, including those cited by Owens–Corning, we find that the fundamental concern with causation in fact that compelled New Jersey's adoption of the heeding presumption, is inherent in our Supreme Court's dispositions of similar cases. In *Sherk, supra* at 594, 450 A.2d at 615, the Court addressed allegations of defective warning where the plaintiff's decedent was shot and killed by one Robert Saenz, playing with a BB gun. *Id.* at 599, 450 A.2d at 618. The plaintiff asserted that because the warnings included with the gun failed to apprise the user of the gun's lethal propensity, the manufacturer must be liable on a theory of failure to warn. *Id.* at 597, 450 A.2d at 617. The Supreme Court recognized, however, that the failure-to-warn defect was not the cause in fact of the plaintiff's injury. The Court reasoned that because Saenz admitted knowledge of the gun's lethal propensity, his conduct and not the inadequate warning caused the plaintiff's injuries. *Id.* at 599, 450 A.2d at 618. In his concurrence, Justice Hutchinson, later judge of the United States Court of Appeals for the Third Circuit, crystallized the

Court's rationale stating: "On the facts of this case we do not reach the issue of whether a failure to provide adequate warning was the ... proximate cause of plaintiff's injuries because such failure was not a cause in fact." *Id.* at 605–06, 450 A.2d at 621.

¶ 15 Similarly, in *Phillips, supra* at 132–33, 665 A.2d at 1171, a toxic tort case, the Supreme Court held that the plaintiffs failed to demonstrate causation because the evidence failed to show that the absence of a warning concerning the lethal propensity of silica sand was the cause in fact of plaintiff husband's exposure. Though Husband testified at trial that he was not aware of the dangers of breathing silica dust, the defendant countered that Husband admitted the contrary during his deposition. The jury determined, specifically, that "Husband knew that he could contract silicosis by exposing himself to respirable silica dust, and voluntarily proceeded to expose himself to the product." *Id.* Affirming the judgment of the trial court, the Supreme Court relied on its reasoning in *Sherk* that because the user actually knew of the lethal propensity of the product, the absence of warnings could not be deemed the cause of the plaintiff's injury. *Id.*

¶ 16 Moreover, careful scrutiny of other cases reveals that this Court too has held proof of causation deficient not because the plaintiff failed to prove that he would have acted to avoid exposure where the evidence demonstrated that his exposure was the cause in fact of his injury, but because the evidence proved an alternative cause in fact. *See Demmler, supra* 671 A.2d at 1155 (reasoning that plaintiff injured by adverse reaction to prescription drug could not demonstrate causal connection between injury and manufacturer's allegedly deficient warning because plaintiff's treating physician testified that he prescribed drug on the basis of his clinical experience without reference to manufacturer's package insert); *Staymates v. ITT Holub Industries,* 364 Pa.Super. 37, 527 A.2d 140,

147 (1987) (reasoning that plaintiff could not show causal connection with manufacturer's failure to warn users to turn off industrial sander before reattaching detached dust collector because plaintiff admitted "knee-jerk · reaction" to reattach bag not likely to be altered by warning).

¶ 17 Accordingly, we conclude that Pennsylvania jurisprudence poses no impediment to adoption of a heeding presumption modeled on the presumption stated in *Coffman,* and indeed appears, implicitly, to accommodate its application. Additionally, because the policies expressed by our Supreme Court in adopting strict liability under Section 402A support the goals advanced in *Coffman,* we conclude that the Court would adopt the heeding presumption to establish legal causation where, as in this case, exposure to the defendant's hazardous product was the cause in fact of the plaintiff's injuries. Consequently, we now hold that in cases where warnings or instructions are required to make a product non-defective and a warning has not been given, the plaintiff should be afforded the use of the presumption that he or she would have followed an adequate warning, and that the defendant, in order to rebut that presumption, must produce evidence that such a warning would not have been heeded. *Compare Coffman, supra* at 603, 628 A.2d 710.

¶ 18 The United States Court of Appeals for the Third Circuit has explained concisely the operation of the presumption:

> While the heeding presumption benefits a failure to warn plaintiff, it does not change the fact that he still bears the burden of persuasion on the causation prong of his § 402A claim.... [T]he heeding presumption [is] rebuttable, and thus, when the opponent of the presumption has met the burden of production thus imposed ... the office of the presumption has been performed; the presumption is of no further effect and drops from the case. To get past the

presumption and to a jury, the opponent of the presumption need only introduce evidence sufficient to support a finding contrary to the presumed fact.

*Pavlik, supra* at 883. Accordingly, if the defendant produces evidence that the injured plaintiff was "fully aware of the risk of bodily injury, or the extent to which his conduct could contribute to that risk," the presumption is rebutted and the burden of production shifts back to the plaintiff to produce evidence that he would have acted to avoid the underlying hazard had the defendant provided an adequate warning. *Id.*

¶ 19 In this case, as in *Sherk, Phillips,* and *Pavlik,* Owens–Corning was afforded the option to produce evidence bearing on the male plaintiffs' knowledge of the risk of injury posed by inhalation of asbestos. The company failed to do so. Consequently, the burden of production did not shift back to the plaintiffs. Thus, Plaintiffs had no obligation to produce evidence that they would have avoided exposure had they been warned of the risk of inhaling asbestos dust. We conclude accordingly that the trial court did not abuse its discretion in refusing to require that Plaintiffs demonstrate that they would have heeded an adequate warning, or in charging the jury on the plaintiffs' burden of proof.

¶ 20 We will now address Owens–Corning's remaining questions on appeal in the order presented. Owens–Corning contends that the evidence was insufficient to establish that any Owens–Corning product caused Plaintiffs' injuries. Brief for Appellant Owens–Corning at 20. Owens–Corning argues that Coward and Vecchione failed to show that they personally worked in the vicinity of a particular Owens–Corning product and that they breathed dust from that product regularly. *Id.* at 20. The company argues similarly, that Poplaski and Watts failed to establish the specific time frame, location and frequency of their exposure. *Id.* at 26 n. 12. The company concludes accordingly that

the court erred in refusing to grant judgment notwithstanding the verdict.

¶ 21 Entry of judgment n.o.v. on the basis of evidentiary insufficiency is appropriate only in a clear case, where the facts are such that no two reasonable minds could fail to agree that the verdict was improper. *Scott v. Southwestern Mut. Fire Ass'n.*, 436 Pa.Super. 242, 647 A.2d 587, 590 (1994). Thus, in considering the trial court's order denying judgment n.o.v., we must determine merely whether competent evidence of record supports the elements of the underlying cause of action. We will view the evidence in the light most favorable to the verdict winner, granting that party the benefit of all reasonable inferences and rejecting all unfavorable testimony. *Ball v. Johns–Manville Corp.*, 425 Pa.Super. 369, 625 A.2d 650, 651 (1993); *Scott, supra* at 590. We will reverse the court's order only where the record demonstrates that its decision resulted from an abuse of discretion in assessing the evidence, or an error of law in adjudging the cause of action. *Id.* We will resolve all doubt in favor of the verdict. *Lilley v. Johns–Manville Corp.*, 408 Pa.Super. 83, 596 A.2d 203, 207 (1991).

¶ 22 In asbestos litigation, evidence is sufficient to establish product identity where the record shows that plaintiff inhaled asbestos fibers shed by that manufacturer's specific product. *Id.* at 207. The evidence must demonstrate that the plaintiff worked, on a regular basis, in physical proximity with the product, and that his contact with it was of such a nature as to raise a reasonable inference that he inhaled asbestos fibers that emanated from it. *See Samarin v. GAF Corp.*, 391 Pa.Super. 340, 571 A.2d 398, 405 (1989) (citing *Eckenrod, supra* 544 A.2d at 52) (affirming entry of summary judgment against plaintiffs where evidence adduced in discovery failed to demonstrate proximity, frequency and identity of products to which plaintiffs were exposed). "A plaintiff must establish more than the presence

of asbestos in the workplace. He must prove that he worked in the vicinity of the product's use." *Eckenrod, supra* at 52. However, he need not demonstrate the specific level or duration of his exposure. *Junge v. Garlock, Inc.*, 427 Pa.Super. 592, 629 A.2d 1027, 1029 (1993); *Lilley, supra* 596 A.2d at 215 (Olszewski, J. concurring).

¶ 23 Upon review of the record, we find ample evidence to support a reasonable inference that Owens–Corning "Kaylo" was used with regularity in the vicinity where each of the male plaintiffs worked and that each inhaled its dust and fibers. Plaintiff Walter Coward, a retired marine electrician suffering from mesothelioma, adduced testimony that he worked within three to ten feet of Owens–Corning "Kaylo" over a period of at least ten years while serving in the naval reserve. N.T. Jury Trial, 10/22/96, at 93, 102. His exposure during that period occurred over two days of each month while serving on weekend duty and during two weeks of continuous service while on active reserve duty. N.T. Jury Trial, 10/23/96, at 142–44. On each day of service he spent "at least twelve hours" in the close confines of naval vessel boiler rooms, where asbestos in block and "mud" form was used to insulate pipes. *Id.* at 141, 144. Coward was personally present when insulation was cut and he recalled breathing dust generated by the cutting. *Id.* at 141. Owens–Corning admitted that "Kaylo" was manufactured with asbestos until the end of 1972, at least six months after commencement of Coward's service in the naval reserve. N.T. Jury Trial, 10/28/96, at 319.

¶ 24 Plaintiff Albert Vecchione, a 58–year–old stone mason whose testimony was preserved by way of deposition, testified that he was exposed to "Kaylo" and a substantial number of other asbestos products at hundreds of commercial construction sites over almost three decades. N.T. Jury Trial, 10/23/96, at 183. Though he did not recite the names of specific job sites at which his exposure occurred, his testimony suggests that asbestos was a common building material, present in large quantities on every job site. Moreover, he recited, in detail, the manner of his exposure as dry asbestos fiber was poured into a hopper to be mixed with water and sprayed onto the steel infrastructures of schools, hospitals, and office buildings. *Id.* at 184. Vecchione described that procedure as "[v]ery, very common" and stated that on each occasion, the air was full of dust. *Id.* at 184, 187. In addition, Vecchione remembered several other procedures during which asbestos pipe covering was cut and stapled, and "the dust would fly all over." *Id.* at 187, 189, 192, 193. He remembered breathing the dust and noted that the pipe covering was "always" Owens–Corning "Kaylo." *Id.* at 192.

¶ 25 Plaintiff Joseph Poplaski, a retired printing press operator, also suffering from mesothelioma, described his exposure from 1946 through 1964 at the Curtis Publishing Company in Sharon Hill. N.T. Jury Trial, 10/28/96, at 341. Poplaski recalled that during his tenure, the company installed fifteen commercial printing presses in the pressroom where he worked. *Id.* at 344. Each press, three stories high, took six months to install and each was treated on site with sprayed-on asbestos insulation. *Id.* at 344. Additionally, each was equipped with "Kaylo" steam pipe insulation that was cut and applied in the pressroom. *Id.* at 353–54. When the asbestos was applied, Poplaski could see the dust in the air, appearing "a little hazy." *Id.* at 350, 355. Poplaski remembered that at least one press was installed across the aisle from his work station. *Id.* at 361.

¶ 26 Finally, Plaintiff William Watts, who suffered from laryngeal carcinoma, testified that he personally handled "Kaylo" while employed for forty-seven years as a bricklayer. Watts stated that he used the product in block form and cut it with a saw to apply in the boiler rooms of newly constructed buildings. *Id.* at 397–98. The product produced dust when

cut, which Watts breathed repeatedly. *Id.* at 398.

¶ 27 Upon review, we find Plaintiffs' evidence legally sufficient to establish that they were subjected to substantially more than a mere presence of asbestos in their respective workplaces. Each man provided testimony that asbestos was present in substantial quantities on a regular and ongoing basis and that "Kaylo" was printed on the packaging of asbestos used. Each man attested that he breathed the dust regularly against a background of other evidence sufficient to verify that each worked for a substantial period of time in the presence of endemic asbestos contamination. We find that this evidence readily satisfies the requisites of our case law. *See Lilley, supra* 596 A.2d at 208. Accordingly, we conclude that the trial court did not abuse its discretion in refusing to grant judgment n.o.v.

¶ 28 Owens–Corning next asserts that the trial court erred in refusing to grant a new trial after it allegedly provided the jury with defective instructions on causation. When assessing the trial court's denial of a motion for new trial, we apply a deferential standard of review.

When assessing the denial of a motion for a new trial, the Superior Court will reverse only where the lower court has clearly and palpably abused its discretion or committed an error of law which controlled the outcome of the case. Where a motion for new trial is based on an allegedly erroneous jury charge, we must examine the charge against the background of the evidence. Even if the charge is in error, a new trial will be awarded only where the jury instruction might have prejudiced the appellant.

*Lilley, supra* at 209 (internal citations omitted).

¶ 29 In support of its assertion, Owens–Corning argues that the court was required to instruct the jury that it might find that the defendant's product caused the plaintiff's injury only if the plaintiff's exposure was regular, frequent and in close proximity with the product. Brief for Appellant at 28–30. This argument attempts to apply the test for sufficiency of evidence of product identity as a test for causation, and is clearly erroneous.

¶ 30 Our cases enunciating the standard for sufficiency of the evidence for product identification specify merely what quantum of evidence is necessary to allow the jury to draw an inference that the plaintiff was exposed to the defendant's product. *See Eckenrod, supra* 544 A.2d at 53 (reasoning that "[w]hether a plaintiff could successfully get to a jury or defeat a motion for summary judgment by showing circumstantial evidence depends on the frequency of the use of the product and the regularity of plaintiff's employment in proximity thereto"). If the jury concludes, based on that evidence, that exposure occurred, it must then make a discrete determination of whether the exposure it found to occur was the cause of the plaintiff's injury. That determination may be made only on the basis of whether the exposure was a substantial contributing factor in bringing about the plaintiff's harm. Contrary to Owens–Corning's assertion, neither *Eckenrod* nor any of its progeny enunciate a separate standard for causation in asbestos litigation. *See* Brief for Appellant at 30 (asserting that "[p]roduct identification, on the other hand, is a proximate cause issue by which plaintiff is required to demonstrate through specific and detailed elements of proof, his proximate workplace exposure to, and resultant inhalation of, the asbestos fibers shed by a particular defendant's product.").

¶ 31 Upon review of the trial court's instruction, having considered it in light of the evidence and the charge as whole, we find it free of legal error. The court instructed the jury concisely, first on the requisite proof of exposure to the defendant's product. The court stated: "[T]he plaintiffs in each case must establish more than an asbestos presence in the workplace generally. They must prove that

they worked near the product and inhaled dust." N.T. Jury Trial, 10/31/96, at 585. We find that this instruction accurately states the law on product identification enunciated in *Eckenrod*. Neither *Eckenrod* nor any of its progeny require that the court explain to the jury the test for legal sufficiency of the evidence. Indeed, because determination of evidentiary sufficiency is not within the province of the jury, an instruction on the elements of frequency, regularity and proximity would be wholly inappropriate and would potentially confuse the jury in its evaluation of causation. The trial court recognized the potential for confusion, *id.* at 598, and acted properly to avoid it. Moreover, the court charged correctly that the test for causation is "substantial contributing factor", and that "[m]inimal or incidental exposure to the defendant's products may be a substantial contributing factor in causing a harmful result." *Id.* at 589. *See Lilley*, *supra* at 215 (Olszewski, J., concurring) ("Minimal, or incidental, contact is a substantial contributing factor in causing a harmful result if that contact produced or substantially contributed to producing such a result.").

■ ¶ 32 Owens–Corning next asserts that the court erred in failing to grant a new trial because it allegedly misconstrued the burden of proof at the non-suit stage of the trial and granted non-suits in favor of additional defendants Pars Corporation and GAF. Brief for Appellant Owens–Corning at 35. Owens–Corning argues that it adduced evidence against Pars and GAF sufficient to establish minimal exposure. *Id.* Upon review, we find this argument perfunctory and unsupported. Owens–Corning fails entirely to describe or discuss its evidence or to argue precisely why it was sufficient to establish the requisite inferences against Pars and GAF. Consequently, we conclude that Owens–Corning has waived this issue and we decline to review it further. *See Olmo v. Matos*, 439 Pa.Super. 1, 653 A.2d 1, 5 (1994) (concluding that failure to support

issue asserted on appeal with relevant facts and authority constitutes waiver).

■ ¶ 33 Owens–Corning next asserts that the trial court erred in failing to grant a new trial on the basis of Plaintiffs' cross-examination of an expert witness who testified during the damages phase of the trial. Brief for Appellant Owens–Corning at 41. Owens–Corning argues that Plaintiffs' questioning concerning the amounts of fees the witness was paid in other asbestos litigation over the previous twenty years was beyond the proper scope of cross-examination and prejudiced the company by promoting excessive verdicts. *Id.* at 41–42. The witness, Theodore Rodman, M.D., testified that asbestos defendants had paid him over one million dollars for expert evaluation of product defect claims in litigation during the twenty year period. We again apply an abuse of discretion standard in evaluating this claim of error. *See Lilley, supra* 596 A.2d at 209 (applying abuse of discretion standard to review of trial court's order denying request for new trial).

¶ 34 Our Supreme Court has recognized that the level of a witness's compensation is a proper subject of cross-examination, tending to flush out the witness's bias. The Court has stated that:

> Whatever tends to show the interest or feeling of a witness in a cause is competent by way of cross-examination.... The fact that an expert witness is to receive, or has received, per diem compensation beyond the legal witness fee does not affect his competency as a witness, and it may have very slight bearing on the question of his impartiality. Nevertheless, his relation to the party calling him may be such as to warrant the jury in taking it into consideration in weighing his testimony.

*Smith v. Celotex Corporation*, 387 Pa.Super. 340, 564 A.2d 209, 213–14 (1989) (quoting *Grutski v. Kline*, 352 Pa. 401, 406, 43 A.2d 142, 144 (1945)). Subsequently, we have limited the field of inquiry on cross-examination to those aspects of the wit-

ness's financial interest that are demonstrably probative of any bias he may harbor in favor of the law firm retaining him, or in favor of parties litigating claims in industry-wide litigation. *See Mohn v. Hahnemann Medical College and Hospital,* 357 Pa.Super. 173, 515 A.2d 920, 923 (1986). Although in *Mohn,* we ultimately reversed the judgment of the trial court, reasoning that the plaintiff's queries were too broad, we did so because the information elicited concerned compensation for services other than expert testimony paid by any law firm or "agency." *Id.* We concluded that the plaintiffs' inquiries were not directed simply to exposing bias, but were calculated to impugn the expert's character, painting him as a " 'hired gun' who peddles his expertise randomly and generates a large amount of revenue in the process." *Id.* 515 A.2d at 924. We recognized as proper, however, plaintiffs' inquiries about the expert's relationship with the defendant's law firm spanning twelve years and pursuant to which the two were still actively involved in thirty cases. *See also Smith, supra* 564 A.2d at 214 (concluding that questioning of defense witness regarding his prior testimony for and compensation from asbestos manufacturers other than the defendant was not beyond permissible scope of cross-examination because, *inter alia,* it was "at least somewhat relevant" to whether expert was biased in favor of asbestos defendants).

¶ 35 Upon review of Plaintiffs' cross-examination in this case, in light of our reasoning in *Mohn* and *Smith,* we cannot conclude that the trial court abused its discretion in permitting inquiry concerning Dr. Rodman's compensation for expert testimony. Plaintiffs inquiry was limited to fees Rodman generated "to give [his] testimony and opinions," on behalf of defendants in asbestos litigation and asked specifically whether his opinions in the case on trial were influenced by that compensation. N.T. Jury Trial, 9/12/95, at 61. It did not serve to impugn the witness's character, but rather to probe the extent to which the witness's identification with asbestos de-

fendants might bias his testimony in this case. We find this objective consistent with our opinions in both *Mohn* and *Smith,* and conclude accordingly, that the trial court did not abuse its discretion in permitting the inquiry.

¶ 36 Owens–Corning, in a footnote, argues additionally that the court erred in refusing to grant a new trial on the basis that the jury was allegedly tainted when Plaintiff Watts referred to a defense witness as "a liar." Brief for Appellant Owens–Corning at 41 n. 16. Owens–Corning fails to demonstrate or even to aver that members of the jury heard and comprehended the comment. Moreover, we conclude that the potential for prejudice in a remark uttered by a party to litigation concerning the veracity of an opposing party's witness is limited by the nature of the parties' relationship. Jurors, in the exercise of their common sense, understand that the parties to a lawsuit are involved in an adversarial relationship and are not likely to be enamored of one another. Thus, even had the jurors comprehended the remark, we find doubtful the company's speculation that they would have adopted the plaintiff's opinion as their own. In any event, Owens–Corning's failure to posit a properly developed argument on this point effectively waives the issue for purposes of appellate review. *See Olmo, supra* 653 A.2d at 5 (concluding that failure to support issue asserted on appeal with relevant facts and authority constitutes waiver).

¶ 37 Finally, Owens–Corning asserts that the court erred in charging the jury on mortality tables reflecting the male plaintiffs' natural life expectancies. Brief for Appellant Owens–Corning at 45. Owens–Corning contends that, in view of the limited life expectancies forecast for the plaintiffs concerned (Poplaski and Vecchione) by their own expert witnesses, the tables had "no realistic value as a measure of how long [the male plaintiffs could] live." *Id.* at 48. The company concludes

accordingly that the court erred in allowing the jury to use the tables as a means to assess the value of the plaintiffs' non-economic damages. *Id.* The company argues also that the court erred in allowing the jury to award non-economic damages for both pain and suffering and loss of life's pleasures. *Id.*

 ¶ 38 We disagree with Owens–Corning's contention that the jury may not be allowed to award damages for "the loss of life's pleasures." Our Supreme Court has recognized that "case law upholds the distinction between loss of life, in which loss of life's amenities is not compensable, and impairment of a living person's faculties, in which instance such loss is recoverable." *Willinger v. Mercy Catholic Medical Center,* 482 Pa. 441, 448, 393 A.2d 1188, 1191 (1978). We have held accordingly that "loss of such pleasures of life is a separate and compensable element of damages in a personal injury action." *Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674, 709 (1982) (citing *Corcoran v. McNeal,* 400 Pa. 14, 23, 161 A.2d 367, 372–73 (1960)). Though a jury may not award damages for loss of life's pleasures for periods of time after the plaintiff's death, it may do so for any period following his injury so long as he may remain alive and subject to impairment. *See Wagner by Wagner v. York Hospital,* 415 Pa.Super. 1, 608 A.2d 496, 502 (1992) (concluding that trial court did not abuse its discretion in allowing jury to award damages for loss of life's pleasures even though plaintiff was in persistent vegetative state).

¶ 39 Though Messrs. Poplaski and Vecchione succumbed to mesothelioma after the damages trial concluded, they remained alive throughout the trial. Though all medical experts agreed that they were terminally ill, and that no one with mesothelioma had survived longer than five years following the onset of the condition, none could forecast when Poplaski and Vecchione would succumb. Consequently, we find no error in the court's instruction allowing the jury to award these plaintiffs damages for loss of life's pleasures.

 ¶ 40 Additionally, we find no error in the court's instruction on the use of standard mortality tables as a measure of the plaintiffs' potential life span for purposes of an award of non-economic damages. Mortality tables are merely a guide to be considered with all other factors in the case for the jury to determine a plaintiff's life expectancy. *Littman v. Bell Telephone Company,* 315 Pa. 370, 376, 172 A. 687, 689 (1934).

> Such tables do not assume to establish as a certainty that any person of the age indicated will live for the identical period specified. With the expectancy indicated by the table as a basis of calculation, the jury must consider the person's health, habits, occupation, surroundings and any other elements which in his case will be likely to operate for or against his longevity.

*Id.* at 376, 172 A. at 689–90. In *Littman,* the Court recognized that "if a man is in poor health, especially if he is suffering from some organic disease which necessarily tends to shorten life, his expectancy is much less than that of a man in robust health." *Id.* The court concluded nonetheless that both his health and the mortality factors are among the numerous factors to be considered by a jury in assessing a plaintiff's potential longevity. *Id.*

¶ 41 In this case, the court instructed the jury in accordance with all of the relevant factors described by our Supreme Court in *Littman.* Following its discussion of the mortality tables, the court instructed as follows:

> These figures are offered to you only as a guide. And you are not bound to accept it, if you believe that the plaintiff would have lived longer or less than the average individuals in this category.
>
> In reaching this decision, you are to consider the plaintiffs' health prior to the injury, his manner of living, his per-

sonal habits and other factors that you may have or that may have affected the duration of his life.

The plaintiffs are entitled to be fairly and adequately compensated for any past, present or future loss of their ability to enjoy any of the plaintiffs' pleasures of life .... any such award, however, can only be made for the loss that will be suffered by a plaintiff during his lifetime.

Pennsylvania does not allow recovery for the loss of life's pleasures following death. In determining how long a plaintiff is likely to live and to suffer from a loss of any of life's pleasures, you should take into account the plaintiff's age and current state of health.

N.T. Jury Trial, 9/14/95, at 605–06. We recognize that the life expectancies projected by the parties' medical experts were substantially less than those published in the mortality tables. Nonetheless, because the tables are to be considered merely as a reference in light of plaintiff's current health, *see Littman, supra,* and because the trial court instructed the jury accordingly, we find no error in the jury's consideration of the tables. Consequently, we conclude that the trial court did not abuse its discretion in refusing to grant a new trial on this basis.

¶ 42 For all of the foregoing reasons, we affirm the order of the trial court denying Owens–Corning's motions for post trial relief and entering judgment.

¶ 43 Order of June 5, 1998 entering judgment is **AFFIRMED**.