SUNBEAM CORPORATION, Montey Corporation, Temrac Company, Inc., Sunbeam Products, Inc., Chemetron Investments, Inc., Allegheny International Canada, Ltd., Eliskim, Inc., and Woodshaft, Inc., Corporations, Appellants

v.

LIBERTY MUTUAL INSURANCE COMPANY, First State Insurance Company, Lexington Insurance Company, and Pennsylvania Manufacturers Association Insurance Company, Corporations, Appellees.

Superior Court of Pennsylvania.

Argued April 30, 1999.

Filed Oct. 26, 1999.

■

Andrew M. Roman, Pittsburgh, for appellants.

Larry A. Silverman and Michael J. Cohen, Pittsburgh, for Pennsylvania Manufacturers Ass'n Ins. Co.

Thomas B. O'Brien, Jr., Philadelphia, for Liberty Mut. Ins. Co.

Before McEWEN, President Judge, and CAVANAUGH, DEL SOLE, JOHNSON, HUDOCK, EAKIN, JOYCE, MUSMANNO and ORIE MELVIN, JJ.

MUSMANNO, J.:

¶1 Appellants Sunbeam Corporation, Montey Corporation, Temrac Company, Inc., Sunbeam Products, Inc., Chemetron Investments, Inc., Allegheny International Canada, Ltd., Eliskim, Inc., and Woodshaft, Inc.[1] (collectively, "Sunbeam") appeal from an Order sustaining the Preliminary Objections in the Nature of a Demurrer filed by Appellees Liberty Mutual Insurance Company, First State Insurance Company, Lexington Insurance Company, and Pennsylvania Manufacturers Association Insurance Company (collectively, "Liberty Mutual") in this breach of insurance contract action. We affirm.[2]

¶2 The pertinent facts of this case are as follows. Sunbeam is the successor-in-interest to the assets and undischarged liabilities of the bankrupt Allegheny International, Inc. and certain of its subsidiaries ("AI"). Liberty Mutual, an insurer, had issued comprehensive general liability insurance policies ("CGL policies") to AI in the 1970s and 1980s. Those CGL policies state that Liberty Mutual will provide insurance coverage to Sunbeam for costs that it incurs to remedy damages caused by an "occurrence," which the policies define as follows:

an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

¶3 The CGL policies also contain a qualified exclusion stating that Liberty Mutual will not provide coverage for costs incurred by Sunbeam to remedy damages caused by environmental pollution or contamination (the "pollution exclusion"). More particularly, the pollution exclusion states that coverage will not be provided for damages "arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water." The pollution exclusion is qualified, however, in that it states that coverage will be provided "if such discharge, dispersal, release or escape is sudden and accidental."

¶4 The pollution exclusion first was approved for inclusion in comprehensive general liability insurance policies by the Pennsylvania Insurance Department, pursuant to insurance regulatory laws, in November 1970, after a request for such approval was made by a national organization representing numerous insurance companies, including Liberty Mutual Insurance Company (the "insurance industry"). Accompanying that request was an explana-

---

1. Appellants other than Sunbeam Corporation all are subsidiaries of Sunbeam Corporation.

2. The following entities are Amici in this case: Dravo Corporation, Aluminum Company of America, Cabot Corporation, PECO Energy Company, PPG Industries, Inc., Waste Management, Inc., United Policyholders, Insurance Environmental Litigation Association, Commonwealth of Pennsylvania, Department of Environmental Protection, Betzdearborn, Inc., ARMCO Inc., Township of Whitehall, Certain Underwriters at Lloyd's, London and London Market Insurers, Coltec Industries, Inc., Consolidated Rail Corporation, and Rohm & Haas Company.

tory memorandum authored by the insurance industry stating in essence that the new pollution exclusion simply clarified, and did not decrease, existing coverage for damages caused by environmental pollution. Prior to inclusion of the pollution exclusion, coverage generally was provided for damages that were not expected or intended by the insured, regardless of whether those damages were caused by a gradual process.

¶ 5 Because of liabilities imposed pursuant to various state and federal environmental laws, Sunbeam incurred significant costs and allegedly will incur more costs to remedy damages caused by environmental pollution at various sites formerly owned by AI. Sunbeam requested that Liberty Mutual provide insurance coverage for those costs under the CGL policies. Liberty Mutual denied those requests, contending that, under the pollution exclusion, it was not required to provide such coverage because the pollution was not caused by a "sudden and accidental" event, but rather was caused by a gradual process.

¶ 6 On August 30, 1995, Sunbeam filed a Complaint in equity against Liberty Mutual based on Liberty Mutual's failure to provide insurance coverage to Sunbeam. Liberty Mutual filed Preliminary Objections in the Nature of a Demurrer to that Complaint, asserting that Sunbeam had an adequate remedy at law for its claims. The trial court sustained those Preliminary Objections and granted Sunbeam leave to file an amended complaint at law.

¶ 7 On September 27, 1996, Sunbeam filed an Amended Complaint against Liberty Mutual asserting breach of contract, tort and various equitable causes of action. In its breach of contract claims, Sunbeam alleged that Liberty Mutual was required to provide insurance coverage for the costs that Sunbeam incurred or will incur to remedy damage at the former AI sites because that damage was neither intended nor expected by Sunbeam. Sunbeam also asserted equity and tort claims, including estoppel and fraud, claiming that Liberty Mutual now should be prohibited from denying coverage based on an interpretation of the pollution exclusion that is different from that previously advanced by the insurance industry when, in 1970, it sought approval of the pollution exclusion from the Pennsylvania Insurance Department.

¶ 8 Liberty Mutual again filed Preliminary Objections in the Nature of a Demurrer, claiming that each of Sunbeam's causes of action failed to state a claim upon which relief could be granted. On April 2, 1997, the trial court sustained those Preliminary Objections, dismissing the Amended Complaint with prejudice.[3] Regarding Sunbeam's breach of contract claims, the trial court concluded that the phrase "sudden and accidental" contained in the pollution exclusion is patently unambiguous and that, therefore, extrinsic evidence would not be considered to establish a latent ambiguity therein. The trial court then determined, based on the definition of the word "sudden" in that phrase, that Liberty Mutual would be required to provide coverage for damages caused by environmental pollution only if that pollution resulted from an abrupt event lasting only a short period of time. Upon reviewing the allegations in the Amended Complaint, the trial court concluded that Sunbeam had not alleged that the damages for which it sought coverage had resulted from "sudden and accidental" events, but rather that those events had occurred "over time." The court then held, as a matter of law, that Liberty Mutual was not required to provide coverage for damages caused by environmental pollution as alleged in Sunbeam's Amended Complaint because the pollution did not result from abrupt events lasting only a short period of time. The trial court also rejected as a matter of law Sunbeam's tort and equity claims because the Pennsylvania Insurance Department did not rely on the represen-

---

**3.** On April 25, 1997, the trial court granted reconsideration of its April 2, 1997 Order. However, on May 23, 1997, it reinstituted its April 2, 1997 Order.

tations made by the insurance industry in 1970, when it granted permission to include the pollution exclusion in comprehensive general liability insurance policies. Sunbeam then filed this timely appeal.

¶ 9 On appeal, Sunbeam contends that the trial court erred as follows:

1. in concluding that the phrase "sudden and accidental" as set forth in the pollution exclusion is unambiguous and that extrinsic evidence could not be considered to determine whether any latent ambiguity exists therein;

2. in determining that the word "sudden" as used in the pollution exclusion should be defined to mean both "abrupt" and "lasting only a short time";

3. in holding that Liberty Mutual could deny coverage based on an interpretation of the pollution exclusion that is different from that advanced by the insurance industry when it sought approval of the exclusion through Pennsylvania's regulatory process; and

4. in applying an arbitrary and vague definition of "sudden" to the allegations of the Amended Complaint such that Sunbeam was precluded from establishing that it satisfied a less arbitrary definition of "sudden and accidental."

¶ 10 Our review of a trial court's sustaining of preliminary objections in the nature of a demurrer is plenary. *Huddleston v. Infertility Center*, 700 A.2d 453 (Pa.Super.1997). Such preliminary objections should be sustained only if, assuming the averments of the complaint to be true, the plaintiff has failed to assert a legally cognizable cause of action. *Shulick v. Painewebber, Inc.*, 700 A.2d 534 (Pa.Super.1997). We will reverse a trial court's decision to sustain preliminary objections only if the trial court has committed an error of law or an abuse of discretion. *Bocchicchio v. General Public Utilities Corp.*, 456 Pa.Super. 23, 689 A.2d 305 (1997).

¶ 11 Sunbeam first contends on appeal that the trial court erred in failing to consider extrinsic evidence when construing the phrase "sudden and accidental" in the pollution exclusion. The trial court, relying on our Court's decision in *Lower Paxton Twp. v. United States Fidelity & Guar. Co.*, 383 Pa.Super. 558, 557 A.2d 393 (1989), determined that, because the pollution exclusion is patently unambiguous, extrinsic evidence could not be considered to construe the phrase "sudden and accidental" contained therein. Trial Court Opinion, 4/2/97, at 12. In *Lower Paxton*, our Court interpreted the phrase "sudden and accidental" in a pollution exclusion clause identical to that at issue in this case and determined that, because that clause was unambiguous on its face, the Court would not consider extrinsic evidence, such as the historical context in which that clause was approved by the Pennsylvania Insurance Department. 557 A.2d at 402 n. 5.

¶ 12 Sunbeam argues that, even if the phrase "sudden and accidental" is patently unambiguous, as the trial court determined, extrinsic evidence nevertheless should have been considered to determine if any latent ambiguity exists therein. In particular, Sunbeam asserts that the trial court should have considered the meaning that that phrase acquired through "usage in the trade," *i.e.*, the meaning that the insurance industry advanced in 1970 when it sought approval from Pennsylvania's Insurance Department to include the pollution exclusion in comprehensive general liability insurance policies. Sunbeam also argues that the trial court should have considered the meaning that that phrase was given by courts when interpreting its use in insurance policies covering "boilers and machines." According to Sunbeam, that extrinsic evidence establishes that the phrase "sudden and accidental" has been defined to mean only "unexpected and unintended." Sunbeam thus argues that, under the pollution exclusion, even with the phrase "sudden and accidental," it should receive coverage for damages caused by environmental pollution as long as they are neither intended nor expected,

even if the pollution results from a gradual process.

▮ ¶ 13 When construing the meaning of an insurance policy, our courts consistently have adhered to the following contract interpretation rules: "When the policy language is clear and unambiguous, the court must give effect to the language of the contract.... Also, the words of the insurance policy must be construed in their natural, plain, and ordinary sense." *Riccio v. American Republic Ins. Co.*, 550 Pa. 254, 263–64, 705 A.2d 422, 426 (1997). Only if policy language is ambiguous will it be construed in favor of the insured and against the insurer as the drafter of the insurance contract. *Id.*

¶ 14 Recently, the Pennsylvania Supreme Court, interpreting certain words in a pollution exclusion clause similar to that involved in this case, emphasized that the "polestar" of insurance contract interpretation "is the language of the ... policy." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999).⁴ With respect to determining whether insurance contract language is ambiguous, the Court stated as follows:

> Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This is not a question to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. **We will not, however, distort the meaning of the language or resort to a strained contrivance to find an ambiguity.**

*Id.* 606, 735 A.2d at 106 (citations and quotations omitted) (emphasis added).

¶ 15 The Court in *Madison* determined that the language in the pollution exclusion clause at issue in that case was unambiguous and that, therefore, extrinsic evidence related to the historical context in which that clause was approved through the insurance regulatory process should not be considered when interpreting its meaning. *See id.* at 608–610, 610–612, 735 A.2d at 108, 109. The Court thus concluded that the words contained in that clause should be interpreted according to their plain meaning. *Id.* at 608–610, 735 A.2d at 108.

▮ ¶ 16 In this case, Sunbeam seeks to avoid application of the fundamental rules of contract interpretation as articulated in *Madison* by asserting an exception to those rules, specifically requesting that we consider extrinsic evidence in the form of a "usage in the trade." As our Supreme Court has stated, "[T]he parol evidence rule does not apply in its ordinary strictness where the existence of a custom or usage to explain the meaning of words in a writing is concerned." *RTC v. Urban Redevelopment Auth.*, 536 Pa. 219, 226, 638 A.2d 972, 975 (1994). Such a usage, however, must be particular and specialized: "Where terms are used in a contract which are known and understood by a particular class of persons in a certain special or peculiar sense, evidence to that effect is admissible for the purpose of applying the instrument to its proper subject matter." *Id.*; *Daset Mining Corp. v. Industrial Fuels Corp.*, 326 Pa.Super. 14, 473 A.2d 584, 592–94 (1984) (holding that extrinsic evidence of usage in the mining industry of various contract terms properly was considered because the industry was "highly technical" and, accordingly, "the attendant terms employed by the parties have no meaning to individuals who are not acquainted with coal mining and therefore have no understanding of the terminology employed by those involved in the business").

¶ 17 The extrinsic evidence that Sunbeam offers in this case simply does not constitute "usage in the trade" as that concept has been applied by our courts. A single explanatory memorandum written to Pennsylvania's Insurance Department

---

4. The Court in *Madison* construed the words "pollutant," "discharge," "dispersal," "seepage," "migration," "release," and "escape" in a pollution exclusion clause. Op. at 606–610, 735 A.2d at 106–108.

in 1970 certainly does not constitute evidence of a generally accepted and applied usage of the phrase "sudden and accidental" by the insurance industry as a whole. Further, judicial interpretation of the phrase "sudden and accidental" as used in "boiler and machine" insurance policies also is not evidence of a usage in the insurance industry and, moreover, is not indicative of an industry-wide standard because it relates to a different kind of insurance policy in a distinct context. Additionally, in its appellate Brief, Sunbeam has cited no legal authority specifically supporting its contention that evidence such as the 1970 memorandum or the judicial interpretation of "boiler and machine" policies can constitute evidence of a "usage in the trade." For all these reasons, we reject Sunbeam's argument that the trial court erred by failing to consider extrinsic evidence of an alleged "usage in the trade" when interpreting the phrase "sudden and accidental" as set forth in the pollution exclusion.

¶ 18 We also reject Sunbeam's more general argument that, regardless of whether it demonstrates a "usage in the trade," that same extrinsic evidence should have been considered to establish that a latent ambiguity exists in the pollution exclusion. When interpreting a contract, a court may consider extrinsic evidence if the contract language is ambiguous, *i.e.,* susceptible to more than one reasonable interpretation. *Samuel Rappaport Family Partnership v. Meridian Bank,* 441 Pa.Super. 194, 657 A.2d 17, 21 (1995). Ambiguities may be patent, appearing on the face of a contract and arising from defective, obscure, or insensible language. *Z & L Lumber Co. v. Nordquist,* 348 Pa.Super. 580, 502 A.2d 697, 700 (1985).

Ambiguities also may be latent, such that they arise from extraneous or collateral facts that render the meaning of a contract uncertain, although the contract language appears clear and unambiguous as written. *Id.* As this Court stated in *Z & L Lumber,* in determining whether an ambiguity exists, a court "should hear the evidence presented by both parties and then decide whether there is objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible [to] differing meanings." *Id.* (quotation omitted).

¶ 19 After reviewing the extrinsic evidence offered by Sunbeam in this case, we conclude that Sunbeam has failed to establish the existence of a latent ambiguity in the phrase "sudden and accidental" as used in the pollution exclusion. Judicial interpretation of the phrase "sudden and accidental" in "boiler and machine" policies simply does not create an ambiguity in the meaning of that phrase as used in the CGL policies at issue in this case, which policies are different and arise in a distinct context from "boiler and machine" policies. Further, a single explanatory memorandum written in 1970, nearly thirty years ago, fails to rise to the level necessary to establish that the terms of the pollution exclusion reasonably are susceptible to the meaning that Sunbeam seeks to ascribe to them. In short, Sunbeam's theory is too tenuous to establish that reasonable minds could differ as to the proper interpretation of the phrase "sudden and accidental" as used in the pollution exclusion. We also note that Sunbeam has offered no analogous Pennsylvania case law in which extrinsic evidence such as that offered by Sunbeam was held to establish a latent ambiguity in an insurance contract.[5] For

---

5. For example, in *Leebov v. United States Fidelity & Guar. Co.,* 401 Pa. 477, 165 A.2d 82 (1960), the only decision by a Pennsylvania court regarding latent ambiguities in the insurance contract context discussed by Sunbeam in the text of its appellate Brief, our Supreme Court, when interpreting certain insurance contract language, considered extrin-

sic evidence that the defendant insurance company, which had denied coverage for a claim, had provided coverage for an identical claim on a prior occasion. *Id.* at 484, 165 A.2d at 86. In this case, Sunbeam has not alleged that Liberty Mutual has provided coverage in the past for claims identical to Sunbeam's. Thus, *Leebov* is distinguishable from

the foregoing reasons, we reject Sunbeam's argument that the phrase "sudden and accidental" as used in the pollution exclusion is latently ambiguous.

¶ 20 Thus, after a careful review of the relevant language of the CGL policies at issue in this case, we conclude that that language, including the phrase "sudden and accidental" as contained in the pollution exclusion clause, is patently unambiguous. Because Sunbeam's efforts to establish a latent ambiguity fail, the trial court did not err in not considering extrinsic evidence to interpret the phrase "sudden and accidental" in the pollution exclusion.

¶ 21 Sunbeam next contends on appeal that the trial court erred in determining that the word "sudden" in the pollution exclusion means both "abrupt" and "lasting only a short time." Based on that definition, the trial court concluded that Sunbeam failed to state legally cognizable breach of contract claims when it set forth allegations in its Amended Complaint indicating that the damages for which it sought coverage were caused by environmental pollution which occurred "over time."

¶ 22 Sunbeam presents several arguments that the word "sudden," even if not latently ambiguous, actually is patently ambiguous and should be defined to mean only "unexpected," a definition without reference to an element of time. Sunbeam bases its arguments on certain principles of contract interpretation and the decisions of courts in other jurisdictions, which have interpreted the same pollution exclusion clause as that at issue in this case and have interpreted "sudden" to mean only "unexpected."

¶ 23 Rejecting Sunbeam's definition of "sudden," the trial court in this case was bound by this Court's decision in *Lower Paxton*, in which we determined that the natural, plain, and ordinary meaning of the word "sudden" included a "temporal element that joins together conceptually the

immediate and the unexpected." 557 A.2d at 402 (quotation omitted). Concluding that any other interpretation of the pollution exclusion would be "blatantly unreasonable," the Court in *Lower Paxton* explained its holding as follows:

> To read "sudden and accidental" to mean only unexpected and unintended is to rewrite the policy by excluding one important pollution coverage requirement—abruptness of the pollution discharge. The very use of the words "sudden and accidental" ... reveal[s] a clear intent to define the words differently, stating two separate requirements. Reading "sudden" in its context, *i.e.*[,] joined by the word "and" to the word "accident," the inescapable conclusion is that "sudden," even if including the concept of unexpectedness, also adds an additional element because "unexpectedness" is already expressed by "accident." This additional element is the temporal meaning of sudden, *i.e.*, abruptness or brevity. To define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage.

*Id.* (citation omitted).

¶ 24 The trial court in this case also noted that, on several other occasions, both before and after the decision in *Lower Paxton*, our Court has determined that the word "sudden" in a pollution exclusion clause includes a temporal element and, therefore, that an insured with such an exclusion in its policy would receive coverage for damages caused by environmental pollution only if resulting from an abrupt event. *See Techalloy Co. v. Reliance Ins. Co.*, 338 Pa.Super. 1, 487 A.2d 820 (1984) (holding that environmental contamination allegedly occurring on a "regular or sporadic basis from time to time during the past 25 years" did not arise from a "sudden" event); *O'Brien Energy Sys., Inc. v.*

this case and does not support Sunbeam's position.

*American Employers' Ins. Co.*, 427 Pa.Super. 456, 629 A.2d 957 (1993) (determining that gradual migration of polluting gases is not "sudden"); *Redevelopment Auth. v. Insurance Co. of North America*, 450 Pa.Super. 256, 675 A.2d 1256 (1996) (concluding that damage caused by pollution continuing over a period of eleven years did not occur "suddenly").[6]

¶ 25 Sunbeam argues that our Court's interpretation of "sudden" in *Lower Paxton* creates an inconsistency with the meaning of the word "accident" as that term is used in the definition of "occurrence," violating the principle that clauses of a contract should be interpreted so that their meanings are consistent. Sunbeam asserts that the word "accident" includes coverage for "injurious exposure to conditions," or damages resulting from a gradual process. According to Sunbeam, if "sudden" is construed to mean "abrupt" and "lasting only a short time," then that construction is inconsistent with the meaning of "accident."

¶ 26 We disagree. In our judgment, the provisions of the CGL policies can be interpreted consistently as follows. Under the general "occurrence" definition, coverage must be provided generally for damages even if resulting from a gradual process, if not related to environmental pollution. Under the pollution exclusion, however, coverage need not be provided for damages caused by environmental pollution. But, that exclusion is qualified such that, for damages caused by environmental pollution resulting from a "sudden and accidental" event, *i.e.*, an abrupt event lasting only a short time, and unintentionally, coverage must be provided. Thus, we reject Sunbeam's contention that our definition of "sudden" creates an impermissible inconsistency between the relevant provisions of the CGL policies.

¶ 27 Sunbeam also argues that, in *Lower Paxton*, our Court's defining of "sudden" to mean "abrupt" improperly adds a requirement not set forth in the CGL policies and not intended by Liberty Mutual, *i.e.*, that the cause of environmental pollution immediately must manifest itself or else coverage need not be provided. We do not agree that the Court in *Lower Paxton* expressly or impliedly added such a requirement. In our judgment, the definition of "sudden" as meaning "abrupt" and "lasting only a short time" reasonably means that coverage will be provided for damages caused by environmental pollution resulting from a discrete event. We believe that the discreteness of such an event can be determined not only by immediate human detection, but perhaps also by expert testimony or other objective evidence obtained after the event occurred. Sunbeam's argument, therefore, has no merit.

¶ 28 Sunbeam also claims that an interpretation of "sudden" that includes a requirement that the cause of environmental pollution "last only a short time" will create "excessive subjectivity and arbitrariness" when applied. Specifically, Sunbeam contends that, if "sudden" is defined as "lasting only a short time," then no definite time period has been established over which an insured can determine that coverage must be provided. Further, Sunbeam argues that, if such a definition can be used, as in this case, to deny coverage merely because of allegations indicating that pollution occurred "over time," it is unworkably arbitrary because all claims then could be denied for that same reason. That is, according to Sunbeam, all environmental pollution occurs "over time," *i.e.*, begins at some point in time and ends at some point in time, including pollution that

---

6. We note that many courts in various jurisdictions, both state and federal, have examined issues relating to the ambiguity, or lack thereof, of the phrase "sudden and accidental" as used in a pollution exclusion provision and have reached varying, even conflicting, conclusions. We note that many courts also have reached varying and contradictory conclusions regarding regulatory estoppel issues such as those raised by Sunbeam in this appeal, which we address in what follows.

lasts only for a short period of time. Thus, Sunbeam argues, the word "sudden" should not be defined to exclude coverage for damages caused by environmental pollution merely because that pollution occurs "over time."

¶ 29 In our opinion, the definition of "sudden" as set forth in *Lower Paxton* is not impermissibly subjective or arbitrary. Indeed, we conclude that environmental pollution that lasts only a short time is readily distinguishable from pollution occurring gradually or over time. We also are certain that our courts can establish further reasonable parameters, if necessary, when confronted with environmental pollution occurring over varying time periods. Moreover, we conclude that the reasonable interpretation of allegations indicating that pollution occurred "over time" is that it occurred as a result of a "gradual" or "prolonged" process. Thus, the interpretation of "sudden" that includes a requirement that pollution "last only a short time" is not arbitrary or unworkable. Therefore, we reject Sunbeam's argument on these matters, as well.

■ ¶ 30 Sunbeam also contends that the phrase "sudden and accidental" in the pollution exclusion is ambiguous because courts in other jurisdictions have differed in their interpretation of that phrase, some defining it to mean only "unexpected and unintentional" as Sunbeam suggests, and some defining it as the court in *Lower Paxton* did. An *en banc* panel of our Court, in *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 451 Pa.Super. 136, 678 A.2d 802 (1996) (*en banc*), *aff'd*, 557 Pa. 595, 735 A.2d 100 (1999), concluded that, if the language of an insurance contract is unambiguous, the Court will not deem it ambiguous simply because courts in other jurisdictions differ as to its meaning and, moreover, will not refer to interpretations thereof given by such courts. Thus, in this case, we cannot consider the pollution exclusion, or the phrase "sudden and accidental" contained therein, to be ambiguous simply because courts in other jurisdic-

tions have given conflicting interpretations to that phrase.

¶ 31 Having disposed of all of Sunbeam's arguments with respect to this issue, we conclude that we agree with our decision in *Lower Paxton* that the word "sudden," construed in its plain, natural, and ordinary sense, includes a temporal element and means "abrupt" and "lasting only a short time." Indeed, we would have to stretch beyond reason the plain meaning of "sudden" to include coverage for damages caused by environmental pollution resulting from a gradual process. Thus, we conclude that the trial court did not err in determining that Sunbeam failed to state legally cognizable breach of contract claims in its Amended Complaint, which contained allegations indicating that the damages for which Sunbeam sought coverage were caused by environmental pollution occurring "over time."

■ ¶ 32 Sunbeam next contends on appeal that the trial court erred in sustaining Liberty Mutual's Preliminary Objections regarding Sunbeam's primary equitable claim based on a theory of regulatory estoppel. In general terms, Sunbeam's regulatory estoppel claim is that Liberty Mutual should be prohibited from denying coverage in this case based on an interpretation of the pollution exclusion which is different from that promoted by the insurance industry in 1970, when it sought approval from Pennsylvania's Insurance Department to include that exclusion in comprehensive general liability insurance policies.

¶ 33 The particulars of Sunbeam's regulatory estoppel claim are somewhat involved. Sunbeam first asserts that, because insurance policies are contracts of adhesion, Pennsylvania's Legislature, to protect the rights of insureds, created a regulatory process pursuant to which insurance companies are prohibited from misrepresenting the terms of a policy, *see* 40 P.S. § 472, must obtain the approval of the Pennsylvania Insurance Department

before they are permitted to include a new provision in an insurance policy, *see* 40 P.S. § 477b, and must file proposed rates with the Department, *see* 40 P.S. § 1184(a). Sunbeam alleges that, pursuant to that regulatory process, the insurance industry, in 1970, requested approval from the Department to include the pollution exclusion in comprehensive general liability policies. Sunbeam avers that, in the explanatory memorandum accompanying that request, to which we previously have referred, the insurance industry represented to the Department that it sought to include the pollution exclusion simply to clarify existing coverage for damages caused by environmental pollution, *i.e.*, coverage would be provided for damages neither expected nor intended by the insured, and regardless of whether those damages resulted from a gradual process.[7] In other words, in that memorandum, the insurance industry did not emphasize the phrase "sudden and accidental" in the new pollution exclusion, nor did it inform the Department that it ultimately intended to define that phrase in such a way that coverage would be provided only for damages caused by environmental pollution occurring as a result of an abrupt event lasting only a short period of time.

¶ 34 Sunbeam further alleges that the insurance industry wrote the memorandum in the manner that it did to induce the Department to approve the pollution exclusion without requiring a correlative reduction in premiums, which reduction allegedly would have been ordered by the Department had it known that the pollution exclusion actually would result in a decrease in coverage. Sunbeam asserts that the Department relied on the memorandum, approving the inclusion of the pollution exclusion without ordering a reduction in premiums. Although Sunbeam itself did not rely on the explanatory memorandum, it claims that, as a beneficiary of the regulatory process, it is entitled to depend on that process and, consequently, on the interpretation of the pollution exclusion given by the Department, which interpretation was based on the Department's reliance on the explanatory memorandum.[8] Thus, according to Sunbeam, it stated a viable claim of regulatory estoppel in its Amended Complaint.

¶ 35 The trial court in this case concluded that Sunbeam's claim of regulatory es-

7. The explanatory memorandum provides in pertinent part as follows:

Coverage for pollution or contamination is not provided in most cases under present policies because the damages can be said to be expected or intended and thus are excluded by the definition of occurrence. The above exclusion clarifies this situation so as to avoid any question of intent. Coverage is continued for pollution or contamination caused injuries when the pollution or contamination results from an accident....

8. As Sunbeam notes, the Supreme Court of New Jersey, in *Morton Int'l, Inc. v. General Accident Ins. Co.*, 134 N.J. 1, 629 A.2d 831 (1993), has recognized a regulatory estoppel claim identical to that asserted by Sunbeam in this case. The court in *Morton*, interpreting the same pollution exclusion clause as that at issue in this case, addressed an insurance company's denial of coverage to an insured pursuant to that exclusion, which denial was based on the fact that the damages for which the insured sought coverage were caused by pollution which occurred as a result of a gradual, not an abrupt, process. *Id.*

The court determined that, based on contract interpretation principles, the word "sudden" in the pollution exclusion included a temporal element. *Id.* at 847. However, the court refused to enforce that exclusion because the insurance industry had submitted to the New Jersey Department of Insurance the same explanatory memorandum as it submitted to Pennsylvania's Insurance Department to obtain approval of the exclusion. *Id.* at 847, 851. The court in *Morton* determined that, in that explanatory memorandum, the insurance industry had misrepresented the true nature of the pollution exclusion to the Insurance Department by asserting that the exclusion would not reduce coverage for insureds when, in fact, the exclusion significantly reduced such coverage. *Id.* at 847. Because the court did not want to reward the industry for its misrepresentation, and in order to preserve the integrity of the insurance regulatory process, the court in *Morton* prohibited the insurance company from denying coverage to the insured pursuant the pollution exclusion. *Id.*

toppel failed primarily because Sunbeam could not reasonably establish that the Department relied on the explanatory memorandum submitted to it by the insurance industry. The trial court determined that the Department, upon submittal of the pollution exclusion to it for approval, would have behaved as a regulatory body, carefully examining the language of the exclusion, including the "sudden and accidental" language therein, and would not have depended on the explanatory memorandum submitted by the industry seeking that approval:

> [Sunbeam's] regulatory estoppel argument requires that I find that after reading the pollution exclusion, the members of the regulatory bodies and their staffs looked to the insurance industry's explanation of the proposed pollution exclusion to determine the scope of the exclusion. However, it is far more reasonable to assume that a regulatory body would attach its own meaning to the language of a proposed exclusion and that it would, in fact, be suspicious of an industry explanation which appeared to be somewhat inconsistent with the proposed language.

Trial Court Opinion, 4/2/97, at 18. The trial court thus stated that the Department would have reviewed independently the unambiguous phrase "sudden and accidental" and would have concluded, as the trial court did, that, under the new pollution exclusion, an insurance company would provide coverage for damages caused by environmental pollution only if that pollution occurred as a result of an abrupt event lasting only a short period of time.

¶ 36 With respect to Sunbeam's argument that the Department, because it did not order a reduction in premiums, must have relied on the explanatory memorandum, the trial court reasoned that the Department may have declined to order such a reduction in premiums for any of a num-

ber of reasons. For example, the Department may have concluded that insurance companies using the policy in effect before the inclusion of the pollution exclusion never had charged their insureds for coverage for damages caused by environmental pollution because those companies had not contemplated significant liabilities for such coverage when that policy was issued. According to the trial court, it may have been that, after realizing that such liabilities might be forthcoming, insurance companies decided to seek approval of the pollution exclusion to limit those potential liabilities.

¶ 37 We agree with the trial court's determination that Sunbeam has failed to establish that the Pennsylvania Insurance Department relied on the explanatory memorandum, an element essential to its regulatory estoppel claim.[9] Despite its allegation in its Amended Complaint that the Department relied on the explanatory memorandum, Sunbeam has failed to aver any additional facts necessary to support that allegation, such as that the Department abandoned its role as a regulator when approving the exclusion. Moreover, we are not persuaded by Sunbeam's arguments that the Department must have relied on the explanatory memorandum because it did not order a reduction in premiums when it approved the pollution exclusion. We agree with the trial court that the Department could have understood that the pollution exclusion would result in a decrease of coverage and still may not have ordered a reduction in premiums. For example, even if insurance companies using a policy in effect prior to the inclusion of the pollution exclusion provided some coverage for damages caused by environmental pollution, as Sunbeam contends they did, the rates that the companies charged for that policy may have included only a minimal sum for such coverage because a majority of

9. Because we determine that Sunbeam has failed to establish that the Department relied on the explanatory memorandum, we con-

clude that the reasoning of the New Jersey court in *Morton* is inapposite to this case.

the environmental laws creating significant liabilities for their insureds were not in effect at the time that that policy was issued. Thus, Sunbeam has failed to make allegations sufficient to establish that the Department relied on the explanatory memorandum merely by not ordering a reduction in premiums when it approved the pollution exclusion. We conclude, therefore, that the trial court did not err in concluding that Sunbeam did not assert a legally cognizable regulatory estoppel claim.

¶ 38 Sunbeam next contends on appeal that the trial court erred in dismissing the other claims in its Amended Complaint, alleging the doctrine of reasonable expectations, estoppel to deny indemnity coverage, fraud and misrepresentation, conspiracy, fraudulent claims handling, conspiracy to fraudulently deny claims, and quasi-estoppel. In its appellate Brief, Sunbeam argues only that those claims are based on the alleged misrepresentations by the insurance industry as set forth in the explanatory memorandum submitted to the Insurance Department in 1970 and that Sunbeam has pled facts sufficient to establish those claims. Sunbeam has failed to develop its argument in any way or to provide us with any analysis of relevant facts or law. Thus, Sunbeam's issues regarding those claims are waived and, accordingly, we need not address them on appeal. *See Coward v. Owens–Corning Fiberglas Corp.*, 729 A.2d 614, 626 (Pa.Super.1999).

¶ 39 Even if those issues were not waived, we conclude, as did the trial court, that Sunbeam's other claims require that Sunbeam establish that the Pennsylvania Insurance Department relied on the explanatory memorandum, a requirement that we previously determined Sunbeam has not met. The trial court, therefore, did not err in dismissing as a matter of law Sunbeam's other claims.

¶ 40 In its final contention on appeal, Sunbeam makes yet another argument that the interpretation of "sudden" that involves a requirement that environmental pollution "last only a short time," as articulated in *Lower Paxton*, creates a definition that is arbitrary and vague. In particular, Sunbeam asserts that the allegations in its Amended Complaint can be interpreted to indicate nothing more than that the environmental pollution occurred at some time in the past, and that no duration element can be inferred from those allegations. Sunbeam argues that, if the trial court can apply the definition of "sudden" as set forth in *Lower Paxton* to such allegations and conclude that they fail to establish a cognizable claim, then that definition can be used to preclude coverage of any and all claims for damages resulting from environmental pollution. Thus, Sunbeam contends that it should be permitted to establish that its allegations satisfy a different, allegedly more workable definition of "sudden" that eliminates the requirement that environmental pollution "last only a short time."

¶ 41 We previously have concluded that the definition of "sudden" as set forth in *Lower Paxton* is not arbitrary or vague. Further, we disagree with Sunbeam's suggestion that the trial court in this case dismissed Sunbeam's claims because the allegations in the Amended Complaint indicated nothing more than that the environmental pollution occurred merely at some point in the past. To the contrary, the trial court dismissed Sunbeam's claims because the allegations supporting those claims indicated that the pollution occurred "over time" or, in other words, as a result of a gradual or prolonged process. We have reviewed those allegations and we agree with the trial court's interpretation of them. Under a fair and reasonable interpretation, the allegations in the Amended Complaint indicate that the pollution underlying Sunbeam's claims occurred gradually and over protracted periods of time. Sunbeam nowhere alleged in the Amended Complaint that any of that pollution resulted from a "sudden and accidental" event. Moreover, we thoroughly

have reviewed the record in this case and we note that Sunbeam appears never to have suggested, let alone asserted (even in its appellate Brief), that any such pollution resulted from a "sudden and accidental" event. We therefore reject Sunbeam's contention that the definition of "sudden" as set forth in *Lower Paxton* is arbitrary and vague and its contention that the trial court improperly applied that definition to the allegations in the Amended Complaint.

¶ 42 For all the foregoing reasons, we reject each of Sunbeam's contentions on appeal. We therefore conclude that the trial court did not commit an abuse of discretion or an error of law in sustaining Liberty Mutual's Preliminary Objections in the Nature of a Demurrer and dismissing Sunbeam's Amended Complaint.

¶ 43 Order affirmed.

¶ 44 McEWEN, President Judge, files a Concurring and Dissenting Statement.

¶ 45 DEL SOLE, J., joins the Concurring and Dissenting Statement.

McEWEN, President Judge, concurring and dissenting:

¶ 1 While the author of the majority opinion has, in usual fashion, provided a comprehensive and compelling expression of view, and while I hasten to agree that the breach of contract claim was properly dismissed by the trial court in response to the demurrer filed by appellees, I cannot agree that the regulatory estoppel claim was properly dismissed.

¶ 2 This appeal has been taken from an order which sustained the preliminary objections in the nature of a demurrer filed by appellees. Thus, we must accept as true all of the factual allegations of the complaint, including the allegations of paragraph 46 of the complaint filed by appellants that

[t]he Pennsylvania Insurance Department relied on these representations, and understood that the proposed endorsement was only a clarification of

existing coverages and would not result in a substantial reduction in coverage. Had the Pennsylvania Insurance Department been told or understood that the endorsement invoked a fundamental change or limitation of coverage, then the submittal would have required a review and approval from the actuarial division of the Pennsylvania Insurance Department to evaluate the necessity of a premium rate change, and a rate reduction would have been warranted. No request for a rate change was submitted by MIRB or IRB relating to this endorsement, and no rate reduction was recommended by the actuarial division of the Pennsylvania Insurance Department or required by the department as a condition for approval.

The trial court, however, sustained the demurrer to the estoppel claim "because Sunbeam could not reasonably establish that the Department relied on the explanatory memorandum submitted to it by the insurance industry."

¶ 3 However, *likelihood* or *predictability of proof* are not elements to be weighed when considering preliminary objections in the nature of a demurrer.

For the purposes of reviewing the dismissal of a complaint based upon preliminary objections in the nature of a demurrer, **the averments of the complaint must be taken as true**, except to the extent that they constitute conclusions of law. *Willet v. Pennsylvania Medical Catastrophe Loss Fund*, 549 Pa. 613, 702 A.2d 850 (1997).

Since sustaining the demurrer results in a denial of the pleader's claim or dismissal of his suit, a preliminary objection in the nature of a demurrer should be sustained only in cases that clearly and without a doubt fail to state a claim for which relief may be granted.... If the facts as pleaded state a claim for which relief may be granted under any theory of law then there is sufficient doubt to require the preliminary objec-

tion in the nature of a demurrer to be rejected.

*Shick v. Shirey,* 552 Pa. 590, 594, 716 A.2d 1231, 1232–33 (1998), quoting *County of Allegheny v. Commonwealth of Pennsylvania,* 507 Pa. 360, 372, 490 A.2d 402, 408 (1985) (citations omitted)(emphasis added). Since both the trial court and this Court in ruling on the merits of the demurrer of appellees are required to accept as true all of the factual allegations in the complaint of appellants and all reasonable inferences flowing therefrom, I would, while affirming that part of the order which dismissed the breach of contract claims, vacate and remand that part of the order which sustained the demurrer to the regulatory estoppel claim.

¶ 4 DEL SOLE, J. joins this Concurring and Dissenting Statement.